**WEEKS DREDGING & CONTRACTING, INC., a New Jersey Corporation and Richard N. Weeks**

v.

**AMERICAN DREDGING CO., a Pennsylvania Corporation, Maylin H. Greaser, Harold G. Adams, William T. Dewitt, William H. Hinton, Jr., Herman Lazarus, Leslie C. Krusen, Arthur P. Desieghardt, and Grover C. Richman, Jr.**

Nos. 78–224 and 78–282.

United States District Court,
E. D. Pennsylvania.

Order Feb. 15, 1978.

Memo March 9, 1978.

Dechert, Price & Rhodes, George J. Miller, Richard L. Berkman, Stephen E. Godsall-Myers, Philadelphia, Pa., for plaintiff.

Cohen, Shapiro, Polisher, Shiekman & Cohen, Patrick W. Kittredge, Alan M. Lerner, Howard J. Kaufman, Joseph M. Donley, Philadelphia, Pa., for defendants.

## ORDER

NEWCOMER, District Judge.

AND NOW, to wit, this 15th day of February, 1978, upon consideration of Plaintiff's Motion for a Preliminary Injunction and after hearing the testimony of witnesses in open court, this Court makes the following findings of fact and conclusions of law and will supplement this decision with a memorandum opinion:

1. This Court has jurisdiction over the parties and subject matter in this lawsuit under 15 U.S.C. § 78aa and 28 U.S.C. § 1331(a).

2. Venue is proper in this district under 15 U.S.C. § 78aa.

3. On January 9, 1978, Weeks Dredging & Contracting, Inc. filed a Registration Statement with the Pennsylvania Securities Commission, respecting a proposed tender offer for shares of American Dredging Company, which Registration Statement contained the Proposed Offer to Purchase by which the tender offer is to be made.

4. In January 1978, Defendant Maylin Greaser, President of American Dredging Company, made statements to the Financial Editor of the *Philadelphia Evening Bulletin* concerning Weeks Dredging's proposed tender offer. His statements were incorporated into an article which appeared in the *Philadelphia Evening Bulletin* on January 13, 1978.

5. The Plaintiff has shown a reasonable likelihood of establishing at trial that Defendant Greaser omitted material facts when he made the above-mentioned statements which rendered the statements made, in light of the circumstances under which they were made, misleading and in violation of Section 14(e) of the Securities Exchange Act of 1934, in that:

a. His statement that the shares were conservatively worth $150 per share was misleading, as he failed to explain that his valuation was based on the shares' value in liquidation or appraisal proceedings, and that the shareholders would only be able to realize significantly more than the roughly current market price of the shares, if the company's earning position was to improve so as to result in the market price of the stock going up in value.

b. The statement that the Company was "shaping up all right" was misleading, as he failed to explain that the reason why the Company was "shaping up" or showing a profit for the 1977 year was because of a settlement award in a condemnation proceeding and not because the operating income of American Dredging Company had increased.

6. The Plaintiff has established that unless this preliminary injunction is issued the Plaintiff will suffer irreparable harm in that American Dredging's shareholders will be prevented from fairly evaluating the Plaintiff's offer to purchase their shares.

NOW, Therefore, the Following Preliminary Injunction is issued against the Defendants American Dredging Company and Maylin Greaser and the Defendants are ORDERED to transmit to all the shareholders of American Dredging by United States first class mail the following letter, prior to the close of business on the day following the receipt of this Order by personal service or otherwise.

Dear Shareholder:

I am writing to you with reference to an article that you may have seen or heard about that appeared in the *Philadelphia Evening Bulletin* on January 13, 1978. In that article, I was quoted as saying that the value of American Dredging stock was conservatively worth $150 per share. This valuation was based on my estimation of the value of the assets of the Company on a per share basis and not on what I believed you could receive on the market today for your shares. In order for the shareholders to realize significantly more than the current market price of the shares at this time, it would be necessary for the company's earnings position to improve.

Furthermore, in the *Bulletin* article, I was quoted as saying that the Company was "shaping up all right." By that statement, I meant that the Company was realizing a profit this year and that that profit was the result of a settlement award in a condemnation proceeding. However, it was not meant and should not mean to you that the operating revenues from the Company's dredging business had increased; in fact, the Company has suffered an operating loss in 1977 in its dredging business.

With regard to the proposed tender offer submitted by Weeks Dredging & Contracting, Inc., you should not construe this letter as an attempt to influence you in any way as to the disposition of your stock.

Sincerely,
Maylin Greaser
President of American
Dredging Co.

This preliminary injunction is issued on condition that Plaintiff file a bond with the Court in the sum of $1,000.00 for the payment of such costs and damages as may be incurred or suffered by American Dredging Company and Maylin H. Greaser if they later prove that they were wrongfully enjoined or restrained by this Order.

This preliminary injunction is binding upon American Dredging Company and Maylin H. Greaser upon their receipt of this Order by personal service or otherwise.

AND IT IS SO ORDERED.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

AND NOW, to wit, this 15th day of February, 1978, upon consideration of the Plaintiff's Motion for a Preliminary Injunction and after hearing the testimony of witnesses in open court, this Court makes the following findings of facts and conclusions of law, and will supplement this decision with a memorandum opinion:

1. This Court has jurisdiction over the parties and subject matter in this lawsuit under 15 U.S.C. § 78aa, 28 U.S.C. §§ 1331(a), 1332 and 1337.

2. Venue is proper in this district under 15 U.S.C. § 78aa and 28 U.S.C. § 1391.

3. On January 9, 1978, Weeks Dredging & Contracting, Inc. filed a Registration Statement with the Pennsylvania Securities Commission, respecting a proposed tender offer for shares of American Dredging

Company, which Registration Statement contained the Proposed Offer to Purchase by which the tender offer is to be made.

4. Amendment No. 1 to the Registration Statement was filed as of January 24, 1978 and contained an amended proposed Offer to Purchase.

5. On February 13, 1978, the Defendants submitted to this Court a Further Offer to Amend Registration Statement.

6. The Plaintiff has established a reasonable likelihood of establishing at trial that the Offer to Purchase and Registration Statement omitted material facts necessary in order to make the statements made not misleading, in light of the circumstances under which they were made, and in violation of Section 14(e) of the Securities Exchange Act of 1934, in that,

a. The Further Offer to Amend Registration Statement fails to state that the Offeror intends to change the duties of the officers of the company;

b. The Registration Statement and the Offer to Purchase fail to state that the factors that are employed to determine the "fair value" of shares in a merger or consolidation are asset value, market value, market prices of comparable companies, market price and earnings ratio, management and its policies, earnings, dividends, valuation of assets, reserves for various contingencies, tax liabilities, future earnings, predictions of future business events, and the like. *In re Watt & Shand,* 452 Pa. 287, 304 A.2d 694 (1973).

7. The Plaintiff has further established that unless this preliminary injunction is issued the Plaintiff and its shareholders will suffer irreparable harm in that a misleading offer will probably be considered by the shareholders in violation of Section 14(e) of the Securities Exchange Act and that no adequate remedy exists at law to compensate for this harm.

8. The Plaintiff has failed to establish a reasonable likelihood of proving at trial that the Proposed Offer and Registration Statement violate Section 14(e) of the Securities Exchange Act of 1934 in the following respects:

a. In the statements made about the value of American Dredging Company's equipment;

b. In the statement of the offering price of the tender offer;

c. In the statements made regarding the Offeror's intention to merge with American Dredging Company;

d. In the choices that the Offeror gives the shareholders in accepting or rejecting the tender offer.

9. The Plaintiff has failed to demonstrate a reasonable likelihood of success in proving at trial its claim that the proposed acquisition of American Dredging Company by Weeks Dredging & Contracting, Inc. will tend to substantially lessen competition in any line of commerce in any relevant geographic market in violation of Section 7 of the Clayton Act.

NOW, Therefore, the Following Preliminary Injunction is issued against the Defendants Weeks Dredging & Contracting, Inc., Weeks Stevedoring Co., Inc., and Richard N. Weeks and its, his, or their officers, directors, employees and agents and these Defendants are ORDERED to amend the Registration Statement and Offer to Purchase in the following respects:

1. At page 76 of the Offer to Purchase, the full paragraph is to read:

"The Offeror has no present plans to take any action which would adversely affect the Company's employees and the Offeror believes that continuity of management is desirable. If the Offeror is successful in obtaining control of the Board of Directors of the Company, it intends to replace the current President of the Company, but hopes to retain him as an employee or consultant. The Offeror has not discussed with the Company whether any of its other executive officers or other personnel will wish to retain their positions upon completion of the Offer, and it has not determined whether it will attempt to replace some or all of such persons; however, the Offeror intends to change the duties of the present officers

474

of the Company. There is no contract, arrangement, or understanding between the Offeror or the Parent, or to the Offeror's best knowledge, any officer, director, or shareholder of either the Offeror or the Parent and any officer or director of the Company or owner of 10% or more of the Shares relating to employment or the purchase of services or property from any such officer, director or shareholder of the Company. Nothing herein contained shall constitute, or obligate the Offeror to offer any employment contracts."

It is noted that the only change in the Defendant's Further Offer to Amend Registration Statement with regard to this paragraph that is mandated by this Order is reflected by the words that are underlined above; the underlining appearing in the above paragraph is not required to appear in the Offer to Purchase.

2. At page 78 of the Offer to Purchase, the following sentence is to be added at line 18 of that page:

"Factors that are considered in determining 'fair value' include asset value, market value, prices of comparable companies, market price and earnings ratio, management and its policies, earnings, dividends, valuation of assets, reserves for various contingencies, tax liabilities, future earnings, predictions of future business events, and the like."

It is Further ORDERED that if the Pennsylvania Securities Commission requires the Defendants to amend the Registration Statement and Proposed Offer in a manner that is substantially similar to either or both of the changes that are required by this Order, the Defendants may substitute the Pennsylvania Securities Commission's amendments for the ones required by this Order upon approval by this Court.

This preliminary injunction is issued on condition that Plaintiff file a bond with the Court in the sum of $1,000.00 for the payment of such costs and damages as may be incurred or suffered by Weeks Dredging & Contracting, Inc., Weeks Stevedoring Co., and Richard N. Weeks if they later prove that they were wrongfully enjoined or restrained by this Order.

This Preliminary Injunction is binding upon Weeks Dredging & Contracting, Inc., Weeks Stevedoring Co., Inc., and Richard N. Weeks and its, his, or their officers, directors, employees and agents, upon their receipt of this Order by personal service or otherwise.

AND IT IS SO ORDERED.

OPINION ON MOTIONS FOR PRELIMINARY INJUNCTION

These cases assume a familiar posture in the world of antitrust and securities law. Weeks Dredging & Contracting, Inc. (Weeks) mounted a take-over effort of American Dredging Company (American). On January 9, 1978, Weeks filed a Registration Statement with the Pennsylvania Securities Commission, whereby it noticed its intention to make a tender offer to American's shareholders and sought approval of its proposal by the Commission. American, fighting the take-over, made statements to both the shareholders and the press about the offer. In response, Weeks filed suit against American, claiming, *inter alia*, that American violated the federal securities law by making false and misleading statements in connection with the tender offer; Weeks sought preliminary and permanent injunctive relief against American. American, too, entered federal court as a plaintiff and sought preliminary and final injunctive relief against Weeks. American asserted that Weeks' Registration Statement contained false and misleading information, and, in addition, that the acquisition of American shares by Weeks violated the federal antitrust laws.

An expedited hearing on the parties' respective motions for preliminary injunctive relief commenced on Wednesday, February 8, 1978, and was completed on Monday, February 13, 1978. At the hearing, the parties stressed that it was crucial that the Court issue its decision by Wednesday, February 15, 1978, as it was likely that the Pennsylvania Securities Commission would allow Weeks' tender offer to go forward at

that time. Unless the Court ruled upon the motions by that Wednesday, the offer would be made to the shareholders without the benefit of this Court's decision on whether the statements made in the Registration Statement violated the federal securities law and whether the offer itself would lead to an antitrust violation. Therefore, on February 15, 1978, this Court did rule upon the Motions for Preliminary Injunction, granting and denying, in part, each of the motions; rather brief findings of fact and conclusions of law were filed at that time. As the motions presented some difficult and interesting issues, the Court takes this opportunity to explain the reasons underlying its decision.

### I. *Weeks' Securities Claims*

The crux of Weeks' action against American evolved from various statements made by the President of American Dredging, defendant Maylin Greaser, to the financial editor of the *Philadelphia Evening Bulletin.* The statements allegedly made by Mr. Greaser were published in the *Philadelphia Evening Bulletin* on January 13, 1978. By the completion of the preliminary injunction hearing on February 13, 1978, Weeks had streamlined its claim, focusing on two statements that were made by defendant Greaser; Weeks claimed that the two statements violated Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e). Section 14(e) provides that

> "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . ."

After reviewing the evidence, the Court concluded that Weeks had shown a reasonable likelihood of establishing at trial that Mr. Greaser omitted material facts when he made his statements to the *Bulletin's* editor which rendered the statements that he made misleading and in violation of Section 14(e). Therefore, the Court ordered American to transmit to its shareholders a corrective letter in a form prescribed in the Court's Order. Before discussing the reasons for the Court's decision, it is necessary first to address the preliminary question of Weeks' standing to sue for injunctive relief under Section 14(e) of the Williams Act.

### A. *Weeks' Standing to Sue for Injunctive Relief Under Section 14(e)*

As a preliminary issue, American raised in a Motion to Dismiss the question of whether Weeks, as a tender offeror, had standing to sue for injunctive relief under Section 14(e). This was the question left open by the Supreme Court in *Piper v. Chris-Craft Industries,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). While the Supreme Court in *Piper* held there was no implied cause of action for damages in favor of an unsuccessful tender offeror under Section 14(e), it specifically refused to rule upon whether a tender offeror could bring a suit for injunctive relief under the Williams Act. 430 U.S. at 43 n. 33, 97 S.Ct. 926.

The *Piper* decision was based, in part, upon a finding that implication of a damage remedy would be inconsistent with the legislative scheme of Section 14(e). The damage remedy in favor of a tender offeror was found not to serve the purpose of Section 14(e) which is the "protection of investors who are confronted with a tender offer." 430 U.S. at 35, 97 S.Ct. at 946. To the contrary, the Supreme Court found that if investors remained shareholders in the target company, they might bear the burden of a substantial damage award in favor of the tender offeror which resulted from the misleading statements of the target company's management. In addition, the Court concluded that any deterrent effect the threat of a damage award might have on the target company's management would be insignificant.

However, where the tender offeror seeks preliminary and final injunctive relief against false and misleading statements made by the target company's management, this Court concluded that implying such a remedy in favor of the tender offeror would not be inconsistent with the legislative scheme. Unlike the damage remedy,

the injunctive remedy does not appear to impose any burden upon investors when it is properly invoked. Furthermore, when the injunctive remedy is employed prior to the time when investors are called upon to render their decision on the tender offer, it allows the investors to arrive at their decision in an environment purged of false and misleading information. The Supreme Court in *Piper* recognized the beneficial effects of this equitable remedy when it said that "in corporate control contests the stage of preliminary injunctive relief, rather than post contest lawsuits 'is the time when relief can best be given.'" 430 U.S. at 42, 97 S.Ct. at 949. The effects of the injunctive remedy for violations of Section 14(e) appear entirely consistent with and further the purposes of the legislative scheme, even though the results are obtained through the efforts of the tender offeror. In fact, to disallow the use of the injunctive remedy solely because its use is urged by the tender offeror would apparently conflict with the Williams Act's interest in protecting investors. In a tender offer situation, where a fight arises between the tender offeror and the target company, often it will only be the management of both entities that is aware of whether statements made to the investors are misleading; it will be the knowledge held by these parties that allows for a timely suit to be brought under Section 14(e) which will protect the interest of the investors. To preclude such a suit solely because it is instituted by the tender offeror would appear inconsistent with the fundamental purposes of Section 14(e).

In *Humana, Inc. v. American Medicorp, Inc.*, 445 F.Supp. 613 (S.D.N.Y.1977), the court held that the Supreme Court's decision in *Piper v. Chris-Craft Industries*, did not preclude a tender offeror from suing for injunctive relief under Section 14(e). And, in that case, the court concluded that a tender offeror indeed did have standing under Section 14(e) when it sought injunctive relief. For the reasons stated in the *Humana* decision and the reasons mentioned above, this Court arrived at the same decision as was reached in *Humana*.

## B. The False and Misleading Statements of Defendant Greaser

Having resolved that Weeks had standing to bring this lawsuit under Section 14(e), it was necessary to turn to the substance of Weeks' complaint. Weeks claimed that two of the statements made by Mr. Greaser violated Section 14(e) of the Williams Act. Having reviewed the evidence, the Court agreed with Weeks' assessment of the statements.

The first statement that the Court found violated Section 14(e) concerned the value of American Dredging stock. Mr. Greaser was quoted in the January 13, 1978, *Philadelphia Evening Bulletin* as having stated that American Dredging's stock was "conservatively" worth $150 per share. Weeks Ex. 15. Further along in the article, the author explained that Mr. Greaser's estimate of the value of American's shares was based on the "total market value of the company's scores of dredges, spare parts for them, repair yards in Camden and Baltimore, plus 2500 acres of land carried on the books at less than $3 million, but appraised at $50 million." Weeks Ex. 15. At the hearing, Mr. Greaser testified that with one exception the article accurately reflected the comments he made in response to the questions posed by the *Bulletin's* editor about Weeks' tender offer; he claimed, though, that he told the editor that American's land was appraised at $30 million, not $50 million. N.T. 2–62. Greaser also gave further explanation as to his method for computing the value of American's shares. He stated that he arrived at the $150 per share value by dividing the total asset value of American by the number of outstanding shares. N.T. 2–63.

Weeks did not seriously quarrel with Mr. Greaser's valuation of the assets of the company, his estimation of the number of shares, or the division he performed; in fact, Weeks did not contend that the $150 figure misrepresented the asset value of American on a per share basis. Rather, Weeks took exception to Mr. Greaser's equation of the asset value of the shares with the "worth" of the shares. Weeks

argued that such equation by Greaser, without further explanation, constituted a misleading statement in violation of Section 14(e).

The Court found that the evidence supported Weeks' charge. Between 1974 and 1978, the bid price for American shares in the over-the-counter market ranged from $19 to $28. Weeks Ex. 1. During that period, the most American paid for its own stock was $26.25 per share. The tender offer by Weeks was for $30.25 per share. Thus, it would seem that based upon the past history of American stock on the over-the-counter market, American shareholders could not expect that the sale of their shares on the market would produce a price substantially in excess of the tender offer price. At the hearing, Mr. Greaser indicated that the only way a shareholder could realize more than the current market price of the shares would be if the company's earning position was to improve. N.T. 2–64. He did not even claim that the asset value of the stock would allow the shareholders to obtain more than the current market price of the shares. While the asset value of the shares might be more significant if the company was planning to liquidate its assets, Mr. Greaser indicated that American had no such plans. N.T. 2–64.

Under the circumstances described above, the Court concluded that Mr. Greaser had omitted facts which made misleading the statement that the shares were conservatively worth $150. In the context of a tender offer of $30.25 by Weeks, the statement that the shares were worth $150 per share would seem to indicate that if the shareholders held on to their shares they could expect to realize $150 per share on the open market; as Mr. Greaser indicated during the hearing, that was not the case. If Mr. Greaser had explained the basis for his statement, the shareholders or investors might not have been misled. For example, if Mr. Greaser had informed the investors that the asset value of the shares only becomes relevant in a liquidation proceeding or the like, then stating the worth of the shares in terms of their asset value might not have been misleading. Another

alternative available to Mr. Greaser would have been to state the asset value of the shares, but inform the shareholders that they could only expect to receive more than the current market price of the shares on the open market if the earnings of the company increased. But to issue a blanket statement of the shares' worth in terms of their asset value could only mislead the shareholders and cause them to believe that they could receive $150 per share if they sold their shares on the open market. American argued that as it was possible that Weeks, if it assumed control, might liquidate the assets of the company, it was not misleading to state the value of the shares by asset value. Nevertheless, even if this eventually was to occur, the shareholders of American at the time when the statement was made were faced with the decision of whether they should tender their shares. The statement by Mr. Greaser appeared calculated to convince the shareholders not to accept Weeks' offer, because they could receive more for their shares if they held on to American stock. But the fact is, as admitted by Mr. Greaser, if the shareholders refused the offer and remained American shareholders they could not expect to receive more than the current market price for their shares unless earnings increased, since American did not intend to liquidate the assets of the company. Therefore, the statement was still misleading in the context in which it was made.

■■■■ Section 14(e) also requires a finding of materiality. Here the Court found that Mr. Greaser omitted material facts which made the statements of the share's value misleading. These omissions were material in that "there [was] a substantial likelihood that a reasonable shareholder would consider [them] important in deciding" whether to accept the tender offer. *TSC Industries v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Omission of a fact which makes a statement concerning the value of the target company's share misleading is material, for value of the stock is likely to be an important consideration to the shareholder. *Cauble v.*

*White*, 360 F.Supp. 1021 (E.D.La.1973). Therefore, it was necessary to conclude that Weeks has shown at least reasonable likelihood of success in proving that Mr. Greaser's statement violated Section 14(e).

■ The second statement that Mr. Greaser made to the editor of the *Bulletin* which Weeks claimed violated Section 14(e) concerned Mr. Greaser's assessment of the financial picture of American. In the January 13, 1978, article, it was reported that Mr. Greaser said in reference to American that, while the final figures of 1977 were not in, "we're shaping up all right." Weeks Ex. 15. This statement appeared untrue and, at least, misleading because of the omission of material facts.

As to the veracity of Mr. Greaser's statement, Weeks presented sufficient evidence to establish a reasonable likelihood of proving at trial that American was not "shaping up all right." A preliminary draft of the report of American's accountants for the year 1977 revealed that American sustained an operating loss in the year 1977 of $1,190,274; in 1976, American had operating income of $823,983. Weeks Ex. 19. While the record is not clear on whether Mr. Greaser had this information available to him at the time he spoke with the *Bulletin's* financial editor, it is clear that he had received and was aware of a November 30, 1977, financial statement of American Dredging. N.T. 2–71. That financial statement reflected that as of November 30, 1977, American had sustained a loss for the year of $495,558.90. Weeks Ex. 16. This evidence certainly supported Weeks' assertion that American was not "shaping up all right"; in fact, the evidence indicated exactly the opposite was the case. However, American argued that Mr. Greaser's assessment of the financial condition of American was correct. To support this assertion, American produced evidence which showed that while the company was suffering an operating loss in 1977 from its dredging business, its net income for 1977 showed a profit. Mr. Greaser testified that American enjoyed a net earning for the year of 1977 of $7.26 per share, and this, in fact, appeared to be a true statement. N.T. 2–78, 79; Weeks Ex. 17. However, this profit resulted, in a large part, from a settlement award that was made in December 1977 in a land condemnation proceeding. Weeks Ex. 19; N.T. 2–79. This increase in net profit per share did not indicate that the operating revenues from American's dredging business had increased, nor did it reflect that the company's dredging business had strengthened. While the settlement award had increased the net income of the company, it was a one-time award which did not reflect a favorable financial outlook for American. Thus, it would appear reasonable to conclude that Weeks could establish at trial that American was not "shaping up all right."

Nonetheless, even if Mr. Greaser's statement was not untrue, it was misleading in the context in which it was made. By failing to explain the reasons for his assessment of the financial situation of American, his statement that things were "shaping up all right" would reasonably lead the shareholders to conclude that the company's dredging business had strengthened. Prior to the publication of the *Bulletin* article, American shareholders had been made aware that their company was suffering a loss in operating revenues in the year 1977. In an August 4, 1977, letter to the shareholders, Mr. Greaser informed them that operations for the first six months of 1977 showed a loss of $0.97 per share. Weeks Ex. 12. Then on September 15, 1977, Mr. Greaser again wrote to the shareholders and notified them of a reduction in the amount of their quarterly dividend; he informed the shareholders that historically the company had its greatest amount of earnings in the second half of the year, but the company had decided to husband the resources of the company until it determined what the final earnings of the company would be in 1977. These two letters taken together paint a picture of a company that has suffered a loss in operating revenues from its dredging business and which is anticipating an increase in those revenues in the second half of the year. On January 13, 1978, the investors were informed via

the *Bulletin* article that American's President reported that the company was "shaping up all right." Under these circumstances, such a report would lead shareholders to reasonably conclude that the improvement in the company's financial condition was a result of an increase in the company's earnings from its dredging business; however, this was not the case. Therefore, by failing to disclose that the settlement award was the reason for American "shaping up all right," American shareholders could reasonably be misled and believe that operating revenues at American had increased.

The Court determined that Mr. Greaser's omissions were material because a shareholder, deciding whether to tender shares, would likely think it important to know whether an improvement in the financial condition of the company was caused by a betterment in the company's business or a one-time financial award which could not be expected again. Thus, Weeks showed a reasonable likelihood of establishing that Mr. Greaser's statement that American was "shaping up all right" violated Section 14(e).

## C. *The Requirements for Issuing a Preliminary Injunction*

In order for a court to issue a preliminary injunction, the party seeking such equitable relief must first establish a reasonable likelihood of prevailing on the merits and that it will suffer irreparable injury unless relief is granted. *Allis Chalmers Mfg. Co. v. White Consolidated Industries, Inc.*, 414 F.2d 506 (3d Cir. 1969). As already stated, the Court found that Weeks clearly satisfied the former requirement. As to the second requirement, that too was met by Weeks. Unless this Court granted preliminary injunctive relief, the shareholders would consider Weeks' offer faced with information that appeared to violate Section 14(e). If this misleading information caused the shareholders to reject Weeks' offer, there would be no adequate remedy available to cure the injury that Weeks suffered.

The Court tentatively decided to grant Weeks' request for preliminary injunctive relief. The order that would issue would require American to send its shareholders a letter, in a form prescribed by the Court, which would correct the misleading information that was disseminated by the *Bulletin* article. Although Weeks requested that the Court also prohibit American from making false and misleading statements and from communicating with its shareholders, the Court denied Weeks' request. No basis had been shown for granting such broad relief.

However, before the injunction could be issued, the Court was required to take into account two other considerations: whether the opposing party would suffer irreparable harm and whether the public would be harmed by the preliminary injunction. *Alaska Interstate Company v. McMillian*, 402 F.Supp. 532 (D.Del.1975). As to the public's interest, this Court did not believe that there was a strong likelihood that the public would be injured by granting a preliminary injunction against American; given the strong likelihood of success that Weeks had shown, a preliminary injunction which ordered American to cure the misleading statements made by Mr. Greaser would only inure to the benefit of the shareholders and the public. The Court did not believe that American would suffer irreparable injury by entry of the preliminary injunction; if, in fact, the statements made by Mr. Greaser were not in violation of Section 14(e), the expense to American would have been the cost of postage and a better informed shareholder constituency. Neither would irreparably harm American. Therefore, the Court concluded that issuing the preliminary injunction against American was proper under the circumstances.

## II. *American's Securities Claims*

As in Weeks' case, by the conclusion of the preliminary injunction hearing, American had narrowed its various securities claims against Weeks to five in number. American claimed that five different statements made in the Registration Statement

and Proposed Offer to Purchase (Registration Statement) that had been filed by Weeks with the Pennsylvania Securities Commission violated Section 14(e). The Court found that American established a reasonable likelihood of proving that two statements did not meet the Williams Act's requirements.

## A. *False and Misleading Statements in the Registration Statement*

◼ The first violation of Section 14(e) which the Court found that American had shown a reasonable likelihood of establishing at trial involved the statements made in the Registration Statement describing Weeks' intention toward the present management of American. In the original statement filed with the Pennsylvania Securities Commission, Weeks claimed that it had made no decision to change or alter the duties of the present management of American if the tender offer was accepted by the shareholders. However, at the hearing, Weeks submitted to the Court a "Further Offer to Amend Registration Statement" which disclosed that the offeror intended to replace the current President of the Company and hoped to retain him as a consultant or an employee; it further stated that Weeks had not determined whether it would replace some or all of the other officers of the company if it obtained control of the Board of Directors.

At the hearing, the evidence established that Weeks had decided that if it gained control of the company, it would replace the current President of American. N.T. 2–45. The evidence also showed that Weeks intended to change the duties of the remaining officers. N.T. 2–45. As neither of these facts were contained in the original Registration Statement, it was clear that the original statement contained at least two false and misleading statements. However, the "Further Offer to Amend Registration Statement" which was submitted by Weeks to the Court corrected at least one of these statements in that it reflected Weeks' intention to replace the current President of American. Such a correction removed any basis for giving relief for the omission in the original statement of Weeks' intention to replace the current President, as it is clear that a defective statement can be cured by an amendment. *Missouri Portland Cement Co. v. H. K. Porter Co.*, 535 F.2d 388 (8th Cir. 1976).

◼ The Court was left to consider whether Weeks' omission of a statement indicating its intention to change the duties of the officers of American violated Section 14(e). An offeror's failure to disclose its intention to change the duties of management upon gaining control of the target company is a material omission for it is a fact that shareholders are likely to think important in deciding whether to tender their shares; who the management of the company will be and what their duties and responsibilities will consist of are considerations that will reasonably be factored into a shareholder's decision of whether to remain an investor in a company. *Cauble v. White*, 360 F.Supp. 1021 (E.D.La.1973). To omit a statement of an intention to change the duties of the officers of the company is misleading in light of an offeror's assertion that with the exception of one individual the offeror has not yet arrived at a decision concerning present management. The shareholders who are not informed of the offeror's plans to change the present officers' duties may be misled and believe that the offeror has not yet arrived at any definite decision concerning management. The omission of such a statement by Weeks therefore appeared violative of Section 14(e).

◼ The Court also found that Weeks' discussion in the Registration Statement of the appraisal rights available to the shareholders upon a merger of the target company with the offeror failed to satisfy the mandate of Section 14(e). In the Registration Statement, Weeks indicated that if it obtained control of American through a tender offer, it was possible that Weeks would cause a merger of American and Weeks. Weeks further stated that if such a merger occurred, dissenting shareholders under the Pennsylvania Business Corpora-

tion law would have the right to receive the approximate fair value of their shares, in lieu of such cash, securities or other property otherwise issuable to them under the terms of the merger transaction. Weeks Ex. 1. However, the Registration Statement did not disclose that the factors that are considered in determining "fair value" under Pennsylvania law are "asset value; market value; market prices of comparable companies; market price and earnings ratio; management and its policies; earnings; dividends; valuation of assets; reserves for various contingencies; tax liabilities; future earnings; predictions of future business events," and the like. *In re Watt & Shand,* 452 Pa. 287, 304 A.2d 694 (1973). The Court found that this omission rendered the statements made misleading.

Weeks' failure to inform the shareholders of the various factors that are employed in assessing "fair value" would allow the shareholders to be misled into believing that only the market value of the shares are important in making the fair value determination. The Registration Statement stressed the effects of the tender offer on the market value of the shares. In the Registration Statement, Weeks informed the shareholders that if the tender offer was accepted, it was possible that the liquidity and market value of the remaining shares held by the public could be adversely affected. Weeks Ex. 1. Weeks' emphasis on market value would possibly misguide the shareholders and permit them to believe that only market value, which might be adversely affected by the tender offer, would be considered in the computation of fair value. As this was not the case in that other factors are taken into consideration when determining fair value, the statements made in the Registration Statement were misleading. The omission of the factors employed to determine fair value is material for there is a substantial likelihood that a reasonable shareholder would find the rights available to him or her after the tender offer an important consideration in deciding whether to accept Weeks' offer. Again, the Court found that there was a reasonable likelihood that American would

establish at trial that Weeks had violated Section 14(e).

B. *Statements in the Registration Statement Found Not to be False and Misleading*

Besides the two statements already discussed, American claimed that several other statements in the Registration Statement violated Section 14(e); the Court could not agree with American's position. The Court ruled that American had not established a reasonable likelihood of proving at trial that these additional statements did not meet the requirements of the Williams Act.

First, American argued that Weeks had made false statements in the Registration Statement about the value of American's equipment. In the "Further Offer to Amend Registration Statement," Weeks stated that

"The Company [American] also owns dredges, scows, barges, tugs and other equipment with which it carries on its business. The Offeror [Weeks] understands that the operating equipment of the Company was carried on its books at approximately $10,400,000 as of December 31, 1976. The Offeror does not know the fair market value of this equipment, but understands that the Company has insured it for substantially in excess of book value. Insurance proceeds from the Dredge 'Philadelphia' and from several other minor items resulted in a gain to the Company in 1976 of $3,698,655. If the major pieces of the Company's equipment were sold, it may be that the proceeds would exceed their book value. The Offeror has no present intention of disposing of any of such equipment."

American contended that Weeks' statement that it did "not know the fair market value of the equipment" was false. At the hearing, evidence was produced which tended to establish that Weeks believed that obtaining four pieces of American's equipment justified Weeks' $10 million investment in the tender offer. American Ex. 12. Testimony was also elicited that showed that American owned 150 pieces of equipment.

N.T. 2–102. A witness testified that it would cost between $15 and $18 million to put one hydraulic dredge into operation and that American owed several hydraulic dredges. N.T. 3–198. In addition, Weeks' officers admitted that Weeks carried its own equipment on the books for less than market value. N.T. 1–82; N.T. 2–133. Furthermore, there was testimony that American insured its equipment for over $38 million. American Ex. 4. Given this evidence, American claimed that Weeks knew the fair market value of American's equipment. Nonetheless, the Court could not accept this contention. None of the evidence presented actually revealed the value of American's equipment. The Court could not accept that the value placed on American's equipment for insurance purposes equaled fair market value. The fact that $15 to 18 million would have to be spent to put a hydraulic dredge in operation and that American owned more than one hydraulic dredge did not necessarily mean that the value of American's equipment exceeded $30 million; there was no evidence as to the condition or actual value of American's hydraulic dredges. Moreover, there was no evidence that showed that Weeks knew the value of American's equipment. The President of Weeks testified that Weeks was unable to make an evaluation of American's equipment because Weeks was not permitted on American's property. N.T. 2–7. Apparently, Weeks had only attempted to estimate the value of American's equipment and had done so on the basis of vague information and assumptions it had made. N.T. 2–11. Although four pieces of equipment might have made the deal worthwhile to Weeks, the value placed on these four pieces of equipment by Weeks was not the "fair market value," but rather the value that these pieces of equipment had to Weeks' dredging business. N.T. 2–24; N.T. 3–127. Therefore, the evidence presented did not even tend to establish that Weeks actually knew the value of American's equipment and that the statement in the Registration Statement was false. In fact, if Weeks had attempted to state the fair market value of the equipment, based on the scanty information before it, Weeks probably would have made a false statement.

■ American argued that even if Weeks did not know the actual fair market value of the equipment, Weeks should have disclosed that it believed that four pieces of American's equipment obtainable through the tender offer justified Weeks' $10 million investment. The Court could not find that the statements made in the Registration Statement imposed such an additional obligation on Weeks. The Registration Statement supplied the shareholders with the information Weeks had about the value of the equipment in the general market. None of the statements made should have reasonably misled the shareholders about the value of the equipment. Therefore, there was nothing said by Weeks which resulted in the imposition of an additional responsibility to inform the shareholders of the unique value of American's equipment to Weeks' business. Section 14(e) is designed only to insure that the information given to shareholders is not false and misleading; it does not require that the offeror disclose all information that it possesses about itself or the target company.

■ Weeks also made certain statements in the Registration Statement concerning the possibility of American's merger with Weeks which American claimed violated Section 14(e). The Registration Statement disclosed that Weeks seeks effective control of American and may "seek in the future possible combination of the Company [American] with Offeror." Weeks Ex. 1. Further along in the Statement, Weeks informed the shareholders that

"Upon consummation of the Offer, the Offeror intends to consider what action, if any, it may wish to take with respect to the remaining shares. Among other things, the Offeror may propose a possible merger or combination between the Offeror (or a subsidiary of the Offeror) and the Company or a liquidation of the Company. Any such merger or combination might be on terms more attractive or less attractive than the Offer, including,

without limitation, at a higher or lower price for Shares payable in cash or the issuance of debt or equity securities or any combination thereof in exchange for Shares. There can, of course, be no assurance that any such transaction will be proposed by the Offeror considered or, if such were proposed, what the terms thereof would be or whether such transaction would be taxable or non-taxable to holders."

The Registration Statement also discussed the rights available to shareholders upon a merger or consolidation. To conclude its discussion on this topic, Weeks stated in the Registration Statement that

"While the Offeror's present intention is as described above, there can be no assurance that any such merger, combination or sale will be proposed by the Offeror or be consummated, or as to the terms of or consideration for any merger, other combination or sale that might take place, and the Offeror reserves the right to act with respect to these matters in accordance with its best judgment in light of the circumstances existing at the time."

American contended that Weeks had already decided that if it gained control of American it would merge American with Weeks, and that Section 14(e) required Weeks to disclose that decision. Clearly, the Registration Statement expressed that Weeks had not reached a final decision on merger; therefore, if Weeks had decided to merge the two companies, it would not have met the mandate of Section 14(e). However, the Court found that the evidence did not establish that Weeks had definitely determined to cause a merger; rather, the evidence showed that Weeks was considering two alternative courses of action, i. e., merger and operating the companies independently.

At the hearing, Richard N. Weeks testified that it would have been impossible for his company to determine prior to the tender offer whether Weeks would merge with American, as information crucial to that decision was not available. N.T. 1–59. He further testified that there were two options open to Weeks if it was successful in the tender offer-merger and independent operation of the companies; he did not know which one would be taken by Weeks. N.T. 2–27. Mr. Dillemuth, Secretary-Treasurer of Weeks, stated that although Weeks' goal was to obtain one hundred percent control of American, there had been no decision on whether there would be a merger. N.T. 2–138. Mr. David Robinson, an officer with the Philadelphia National Bank, gave testimony about a meeting he had with Weeks' officers at which a possible bank loan to finance Weeks' take-over effort was discussed. Mr. Robinson testified that at his deposition he had stated that Weeks' officers indicated at the meeting that American's future would be examined after the tender offer. N.T. 3–128. The testimony of Mr. Weeks, Mr. Dillemuth and Mr. Robinson indicated that Weeks had not finally outlined its plans for American prior to submitting the tender offer. However, American produced additional testimony which it argued proved otherwise. Mr. Brian Stephen O'Leary, an assistant Vice President of Marine Midland Bank, testified about a meeting members of his bank had with officers from Weeks, where possible loan arrangements were discussed. His notes from that meeting reflect a notation of "goal—get 80%, merge, force out minority." American argued that this evidence conclusively established that Weeks had made the ultimate decision on merger. However, While Mr. O'Leary testified that the merger comment was most probably said by someone from Weeks, he indicated that as he recalled the discussion, "the company was unclear what they wanted to do, assuming they got control of the company. They did not know how they would treat the company." N.T. 3–48. Mr. O'Leary also stated that he did not know what the company fully intended to do if Weeks was only able to secure 51% of the shares in the tender offer; he was not sure whether they would seek to merge the companies. N.T. 3–60.

The Court concluded that the evidence presented did not establish that Weeks had definitely decided to merge the two compa-

nies. Although merger was a strong possibility, it appeared that Weeks had not arrived at a final decision. Circumstances arising upon completion of the tender offer might dictate whether a merger was feasible and advisable. For instance, in the Registration Statement, Weeks indicated that it did not know American's corporate requirements for merger and did not know what percentage of the shareholder vote was necessary for merger approval; depending upon the corporate requirements and the extent of Weeks' success in the tender offer, it might or might not be possible for Weeks to effectuate a merger. In addition, as Weeks could not fully forecast the economic situations that would occur within American and Weeks after the tender offer, it could not foreclose the possibility that the companies would be operated independently. As was the case in *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937 (2nd Cir. 1969), if the offeror "acquired control as a result of a tender offer, the circumstances might or might not suggest a merger—an issue that could and presumably would be explored with the deliberation then possible." 409 F.2d at 948. Given that the evidence did not show that Weeks had formulated a definite merger plan and, indeed, did show that Weeks had disclosed the possibility of a merger upon completion of the tender offer, the Registration Statement could not be said to be in violation of Section 14(e). When definite plans for merger have not been formulated, to require that the offeror disclose more than what Weeks had already disclosed would hold some potential for miscommunication to the shareholders. *Alaska Interstate Co. v. McMillian,* 402 F.Supp. 532 (D.Del.1975); *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851 (2nd Cir. 1974). Therefore, no Section 14(e) violation could be predicated on Weeks' statements concerning the merger.

The next statement which American claimed did not satisfy the requirements of Section 14(e) was that of the offering price for American shares. In the Registration Statement, Weeks made clear its intention to offer $30.25 a share for American stock. American argued that the twenty five cent figure in the offer price was misleading for it implied that the tender offeror gave great thought and consideration to the value of the shares and to a "proper price." The testimony at the hearing revealed that Weeks had not engaged in a complicated analysis to reach the offering price. In fact, Mr. Gerard S. Dillemuth, the Secretary-Treasurer of Weeks, indicated that the twenty-five cents was added to the offer price because those responsible thought it would look like the offeror did "horrendous work in trying to evaluate the actual price." N.T. 2–136. Be that the case, the Court did not find that the statement of offer price was in violation of Section 14(e). First, the offer price was not a false statement; $30.25 was what Weeks was offering for the shares. Secondly, the Court could not agree with American that the failure to state that the offeror did not engage in a complicated analysis to reach the $30.25 figure was a material omission that made the statement of price misleading. The Registration Statement did not represent that the proposed purchase price was the result of Weeks' engaging in detailed analysis. Nor did the Court believe that there was a substantial likelihood that shareholders would believe it important that the offering price was not a round number; the Court did not accept Mr. Dillemuth's theory that the shareholders would believe that this figure represented "horrendous work" on the part of the offeror. Rather the Court found that this type of "puffing" is what investors are accustomed to and is not a factor upon which they rely in making their decision to tender their shares. Section 14(e) requires the Court to censure misleading statements made in connection with a tender offer; it does not mandate or permit the Court to go behind the statement of offering price to determine whether the offeror has made a detailed analysis in determining what price to offer for the target company's shares. The Securities Exchange Act does not demand that an offeror inform the shareholders of how it arrived at the tender offer price, and without such

a statutory directive, this Court refused to impose such a requirement upon the offeror.

American's final securities claim against Weeks involved not one or two statements in the Registration Statement, but the total design of the Registration Statement. American argued that the Registration Statement's design was misleading because it invited shareholders to believe that they had no choice but to tender their shares, when, in fact, the Registration Statement should have disclosed that if the shareholders did not tender their shares they would receive substantially in excess of the tender offer price when Weeks merged with American. Certain statements in the Registration Statement, American contended, would lead the shareholders to conclude that they had no choice but to tender their shares. These statements included statements that if the offeror was successful in obtaining control of American, shareholder dividends would be eliminated and the market value and liquidity of American shares could be adversely affected. In addition, the Registration Statement notified the shareholders that there were various loan restrictions that would be placed on American in connection with the financing of the tender offer. Weeks Ex. 1. While these statements might indicate the considerations that favored tendering the shares, there was no contention that the statements, in and of themselves, were false or misleading. In fact, it appeared that American shareholders had the right to be apprised of these facts. The Court did not agree that these statements would mislead the shareholders and cause them to believe that they had no choice but to tender their shares. The Registration Statement made quite clear that the decision of whether or not to tender was for the shareholders' consideration. The Registration Statement, taken in its entirety, outlined several possibilities for the future of American. There was the possibility that an insufficient number of shares would be tendered and that Weeks would not assume control; in that case, presumably, business at American would continue as normal. There was the possibility that Weeks would be able to gain control through the tender offer and would operate the business independently of its own business; in that situation, it was possible that the market for American shares might increase or decrease. And then there was a possibility that there would be a merger. The Registration Statement informed the shareholders that in that situation, shareholders would have the right to receive the fair market value of their shares, which might be higher or lower than the tender offer price. What the Registration Statement presented to the shareholders was a list of their options and possible American forecasts. These options and forecasts did not appear to the Court false or misleading.

American disagreed. The crux of its complaint was that Weeks had falsely painted one of the forecasts of American. American insisted that Section 14(e) required Weeks to inform the shareholders that American and Weeks would merge and when that merger occurred, American shareholders would receive substantially more for their shares than the tender offer price. This Court has already discussed its reasons for not finding that the merger could be definitely forecasted; it was possible that the companies would be operated independently. In order to avoid misleading statements, it was necessary for Weeks only to state the merger as a possibility and not a certainty. And as to the consideration that American shareholders would receive upon a merger, that too could not be definitely stated. Weeks did not claim that from appraisal proceedings American shareholders would receive less than the tender offer price; rather, Weeks indicated that the shareholders might net more or less than the tender offer price in such a situation. However, American argued that the asset value of the company's equipment and land on a per share basis assured the shareholders that they would receive more than the tender offer price in appraisal proceedings. As this Court has already stated, there are a number of factors that are employed to determine the "fair value" of a

company's stock in appraisal proceedings. How these factors will be balanced at a future time cannot now be known. A prediction of the results of an appraisal proceeding, therefore, cannot be the basis for finding a present Section 14(e) violation. Beyond requiring the offeror to delineate the factors employed in such a proceeding so that the shareholders will have sufficient information to make their own evaluation as to the future "fair value" of the shares, the Court can do no more. The Court cannot determine that the appraisal proceedings will yield more than tender offer price. As the Registration Statement stated that it was possible that shareholders would receive more than the tender offer price at a future appraisal proceeding, the Court could not find that Weeks' forecasts for American were misleading. Therefore, relief was denied on this claim.

### C. The Requirements for Issuing a Preliminary Injunction

█ Although the Court rejected the majority of American's securities claims, it had found that American had shown a reasonable likelihood of establishing at trial that two of Weeks' statements violated the Williams Act. As was the case with Weeks' securities claims, without a preliminary injunction the shareholders would consider the tender offer material submitted by Weeks even though it contained misleading information. For the same reasons as existed in Weeks' case, the Court decided that a preliminary injunction was required.

Nonetheless, the Court refused American's requested relief of enjoining the tender offer. The Court found that for the violations which American had reasonably established that it could prove at trial, sufficient relief would be granted if Weeks was ordered to amend its Registration Statement so as to supply the shareholders with additional information that would remedy the misleading nature of the information supplied by the statement. As an amendment would adequately remedy the apparent violations of Section 14(e), imposing the drastic remedy of enjoining the

tender offer would not serve the purposes of granting preliminary injunctive relief.

### III. American's Antitrust Claim

█ American also sought preliminary injunctive relief under federal antitrust law. It alleged that Weeks' acquisition of American stock through the tender offer would violate Section 7 of the Clayton Act, 15 U.S.C. § 18. Section 7 provides, in pertinent part:

> "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly."

To discover whether a violation of Section 7 is threatened, three separate, but somewhat interrelated, determinations must be made. A Court must determine (1) the relevant line of commerce, (2) the relevant geographic market and (3) the acquisition's effect on competition in the relevant line of commerce in the relevant geographic market. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Having reviewed the evidence and having made those determinations, the Court concluded that American failed to establish a reasonable likelihood of proving its antitrust claim at trial.

### A. The Relevant Line of Commerce

█ As the Supreme Court recognized in Brown Shoe, while "the outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it," within the broad market, submarkets may exist which constitute separate lines of commerce for the purposes of Section 7. 370 U.S. at 325, 82 S.Ct. at 1523. The determination of whether a given submarket is cognizable for antitrust purposes as a relevant "line of commerce" or "product market" rests upon the consideration of a number of factors. Those factors, as enunciated in Brown Shoe,

include "public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325, 82 S.Ct. at 1524.

In this case, Weeks argued that the relevant line of commerce was the dredging business; this is the business in which both Weeks and American engage and which Weeks argued could only be affected by the tender offer. American sought to narrow the product market; American's position was that dredging was the "outer boundaries" of a product market and that within this product market there was a distinct submarket, bucket dredging, which constituted a separate line of commerce for antitrust purposes. Upon the evidence presented at the hearing, the Court accepted American's position.

To arrive at the determination that "bucket dredging" as opposed to "dredging" constituted the relevant product market, it was necessary for the Court to leap certain definitional hurdles. The preliminary injunction hearing provided the Court with a lesson of the terms and operations employed in the dredging business. To begin, the business of dredging is the removal of solid material from the bottom of various bodies of water for the purposes of enlarging, deepening, clearing or changing the flow of that body of water; dredging also involves the disposal of the materials removed from the water. N.T. 3–141. Dredging is used, *inter alia,* in establishing channels for the passage of ships, building tunnels, and to build up areas of land. N.T. 3–146. Unsurprisingly, dredging is performed by large machinery called dredges. Dredges are usually not self-propelled (with the exception of the hopper dredge) and must be towed, or otherwise transported from site to site. N.T. 3–152.

There are three basic varieties of dredges —hydraulic, hopper, and bucket. Hydraulic dredges employ a cutter head which is lowered into the water against the material to be dredged; the cutter head revolves and breaks up and loosens the dredging material. A vacuum tube or pipe which is located beneath the cutter head sucks up the loosened material. The loosened material is then carried through a pipeline, by the force of a pump, to the area of disposal. The dredged material picked up and pumped away by the hydraulic dredge consists of approximately 85 to 95% water and 5 to 15% solids. N.T. 3–147. Hopper dredges are self-propelled and they move along the channel to be dredged with a long vacuum tube lowered to the bottom. They do not have a cutter head. The material that is being accumulated by the dredge is pumped into tanks or hoppers in the dredge; when the hoppers are full, the hopper dredge proceeds to an unloading point and disposes of the material. N.T. 3–153– 154. Bucket dredges have a bucket or shovel-like apparatus that is used to retrieve the dredged material. After the dredged material is scooped up by the bucket it is then deposited either off to one side or placed in a barge which is towed by a tugboat to the disposal area. There are several kinds of bucket dredges, including clamshell, drag line, dipper and backhoe dredges. N.T. 3– 147–150.

■ Various characteristics of the "bucket dredging" business that were revealed at the hearing required the preliminary finding that "bucket dredging" constitutes a relevant and distinct line of commerce. "Bucket dredging" is relevant to this case because it is a business in which both Weeks and American engage; while American also operates an hydraulic dredging business, Weeks does not. As to the characteristics of bucket dredging which require the finding that it is a distinct line of commerce, the Court found that several of the indicia noted in *Brown Shoe* as evidencing a line of commerce typify the bucket · dredging business.

First, in *Brown Shoe,* the Supreme Court instructed that one factor relevant to the line of commerce determination is public recognition of the submarket as an economic entity. American presented to the Court a Schedule of Advertisement prepared by

the Army Corps of Engineers listing the dredging jobs on which the Corps solicited bids from August 1976 to September 1977. American Ex. 21. In that Schedule, the Corps listed the type of dredging that would be required on each job. Different types of dredging, by the types of dredges, e. g., hydraulic pipeline and bucket/clamshell, were named. It was apparent that at least the Corps, apparently the largest customer in the dredging business, recognized that there were different dredging businesses.

The second factor enunciated in *Brown Shoe* is the peculiar characteristics and uses of the product. The evidence presented concerning this factor strongly supported the finding that "bucket dredging" constitutes a distinct submarket of the dredging business which is cognizable as a line of commerce. As hopper dredging appears only to be performed by the Army Corps of Engineers and the Corps does not compete in the public market, it is necessary only to compare hydraulic dredging with bucket dredging, for it is only these two types of dredging operations that constitute the private dredging business. N.T. 3–152. Bucket and hydraulic dredging are different in their respective methods of disposal. To dispose the dredged material, the bucket dredge lifts the material from beneath the water and places it upon a barge which is then towed to a disposal area; the hydraulic dredge disposes of the dredge material via a pipeline that leads directly to the disposal area. This difference is critical for, to a large extent, it dictates which type of dredging will be performed. In order to use an hydraulic dredge, the disposal area must be nearby. N.T. 3–147; 3–194. Since the dredged material is towed away from the bucket dredge, that requirement is not present when the bucket dredge is employed. N.T. 3–195. Thus, if a disposal area is not close to the dredging site, an hydraulic dredge cannot be employed and the consumer must turn to bucket dredging. Furthermore, the hydraulic dredge's pipeline allows the hydraulic dredge to be used for certain jobs which the bucket dredge cannot adequately perform. For example,

when a customer wants material to be dredged to fill land, the testimony established that this type of job is almost exclusively done by hydraulic dredging because the pipeline permits the dredged material to be pumped directly into the area. N.T. 3–155. For similar reasons, hydraulic, and not bucket, dredging is used in jobs where the object is to stop beach erosion. N.T. 3–192. Another difference between bucket and hydraulic dredging which often requires that these dredges be put to different uses is the types of material which these dredges can dislodge. Unless the material is preblasted, the hydraulic dredge's cutter edge is often unable to break-up very hard or dense material. N.T. 3–148; 3–195. However, bucket dredges, especially the backhoe and dipper types, are able to penetrate this dense material and are usually employed to dredge such material. N.T. 3–149; 3–145. While there is some interchangeability between bucket and hydraulic dredging, the peculiar characteristics of each kind of dredge usually dictate when each will be employed.

The third *Brown Shoe* factor that supported finding "bucket dredging" as a line of commerce was the "unique production facilities" of bucket dredging. As already discussed, bucket dredging equipment is very different from hydraulic dredging equipment. The machinery is not interchangeable. For example, the record indicates that Weeks, a bucket dredging operation, was unable to enter the hydraulic dredging business, because its bucket dredging equipment could not be employed for hydraulic dredging.

*Brown Shoe* also directs a court to determine whether distinct customers and distinct prices exist for the submarket. Although only scanty evidence was presented on these points, there was some indication that hydraulic and bucket dredging attract different customers and different prices. The type of dredging requested by a customer appears to have some correlation to the region in which the dredging is to be performed. For example, hydraulic dredging is the principal dredging requested by

customers in the Gulf Coast area, N.T. 3–193; in the Northeast Atlantic Coast states, bucket dredging seems to be the principal dredging performed. N.T. 3–148. As to prices, the testimony indicated that bucket dredging is more expensive than hydraulic dredging. Both parties' expert witnesses testified that hydraulic dredges are the most economical dredges as they move the most yardage per unit of cost. N.T. 3–194; 3–151.

The last two factors mentioned in *Brown Shoe* are specialized vendors and sensitivity to price changes. Very little, if any, evidence was presented on the presence or absence of these characteristics. Thus, the Court did not consider these factors in making its determination.

 For the reasons articulated above, the Court concluded that the *Brown Shoe* criteria indicated that bucket dredging constitutes a distinct line of commerce. Nonetheless, Weeks contended that there was some competition between bucket and hydraulic dredging which precluded such a finding. Indeed, there was some testimony which indicated that there were some situations in which hydraulic and bucket dredging compete in the same market. Generally, these situations arise when it is possible to use either type of dredging, but neither optimally. N.T. 3–195. However, the fact that there is some competition between two submarkets does not prevent the existence of two lines of commerce. *United States v.*

*Aluminum Co. of America,* 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964). Therefore, upon the evidence presented at the hearing, bucket dredging was designated as the relevant line of commerce.[1]

### B. *The Relevant Geographic Market*

The determination of the relevant geographic market is an important consideration in an antitrust case. If the market is defined too broadly, anticompetitive action, which is proscribed by Section 7, might go undetected. On the other hand, if the market is defined too narrowly, behavior which does not tend substantially to lessen competition in a section of the country, improperly might be found to fall within the ambit of the Clayton Act. In this case, the Court could not accept the relevant geographic markets proposed by the parties. American urged that the relevant "sections of the country" were the North Atlantic, South Atlantic, Gulf Coast, the New York/New Jersey harbor area and the Jacksonville harbor; however, the evidence established that American's designated geographic markets sliced the pie too thinly. Weeks contended that the relevant geographic market was the combined East Coast and Gulf Coast area; this definition of the geographic market basically did not slice the pie at all. Upon the evidence presented at the preliminary injunction hearing, the Court concluded that the relevant geographic market was the East Coast.

1. From what has already been stated, it should be apparent that the Court would have found hydraulic dredging a distinct line of commerce. However, hydraulic dredging was not defined as a *relevant* line of commerce, because generally a line of commerce is relevant to a case because it is a product market in which both companies engage; here the evidence showed that Weeks was not engaged in the hydraulic dredging business. Even though a company is not a competitor in a product market, that product market can be relevant if the evidence shows that the company is a potential competitor in the market. Under the potential competitor doctrine, hydraulic would be relevant if it was shown that Weeks, independently of its acquisition of American, was so situated in the hydraulic dredging industry as to be a potential competitor likely to exercise substantial influence on the hydraulic dredging market behav-

ior. *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). Although there was testimony revealing that Weeks had an interest in entering the hydraulic dredging market, the evidence did not establish that, without the American acquisition, Weeks had the "characteristics, capabilities, and economic incentive to render it a perceived potential de novo entrant" likely to affect the behavior of existing participants in the hydraulic market. *United States v. Marine Bancorporation,* 418 U.S. 602, 625, 94 S.Ct. 2856, 2871, 41 L.Ed.2d 978 (1974). To even purchase an hydraulic dredge would have cost Weeks in the neighborhood of $15 to $18 million, an amount Weeks did not appear willing to spend. Therefore, the Court concluded that the potential competitor doctrine was inapplicable, and that the only relevant product market was bucket dredging.

■ The effort of attempting to outline a relevant geographic market involves pinpointing where the effect of an acquisition on competition will be immediate and direct. *United States v. Marine Bancorporation,* 418 U.S. 602, 621, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974). Generally, an area in which the effects of competition will be direct and immediate is an area in which the competitors market their relevant products or services and to which customers can practicably turn for supplies. *United States v. Philadelphia National Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Of course in any given situation, there can. be more than one relevant geographic market.

■ As to where the competitors, Weeks and American, market their respective dredging services, the evidence established that American competes in the East and Gulf Coast areas and that Weeks basically competes in the East Coast area. American supplied the Court with a statement of the jobs on which it bid in the years 1975 through 1977; this statement indicated that American had bid on jobs in these years which would have taken the company all over the East and Gulf Coasts. American Ex. 20. On the East Coast, American had sought dredging contracts in Massachusetts, Connecticut, New York, New Jersey, Maryland, Delaware, Rhode Island, Virginia, Pennsylvania and Florida; it was apparent that American had not isolated its business to one section of the East Coast. In addition, American had competed in the Gulf Coast states of Louisiana and Texas for dredging contracts. American also had bid on jobs in Puerto Rico. Weeks' marketing of its dredging business was somewhat more limited. Mr. William J. McPhillips, Vice President of Weeks, testified at his deposition that Weeks had bid on jobs that required performance in Connecticut, the New York-New Jersey area, Florida, Virginia, the Baltimore-Washington area, and Puerto Rico. At the hearing, Mr. Weeks noted that Weeks did not compete for contracts on the Gulf Coast. N.T. 1–73. Mr. Greaser, President of American, indicated at his deposition that both American and Weeks had bid on jobs up and down the East Coast, running from Maine to Florida. From the evidence presented, it was clear that at least the area in which both Weeks and American market their respective services is the East Coast.

Within the East Coast region, there are several local areas in which both Weeks and American market their services. American contended that two such areas were the New York-New Jersey harbor and vicinity and Jacksonville, Florida, and the evidence showed that to be the case. From 1975 through 1977, American had bid on at least thirteen jobs in the New York-New Jersey harbor and vicinity. American Ex. 20. While Weeks has not done any work in that area during the past year, testimony was presented revealing that in the past Weeks bid on and did substantial work in the New York-New Jersey harbor and vicinity. N.T. 1–75. Similarly, in the Jacksonville, Florida area, both Weeks and American have marketed their services; since 1973, American and Weeks have each bid on at least four jobs in Jacksonville. American Ex. 20; McPhillips Dep. at 76, 84. However, it should be noted that there are other local areas in which both Weeks and American have marketed their services. For example, both Weeks and American have bid on jobs in Connecticut, Virginia, Maryland and Puerto Rico. American Ex. 20; McPhillips Dep. In fact, it appears that in all localities in which Weeks has marketed its services, so too has American.

The evidence having revealed that both Weeks and American market their services in the East Coast, the New York-New Jersey harbor and vicinity, Jacksonville, Florida, Virginia, Maryland and Puerto Rico, to determine the relevant geographic market or markets it became necessary to look to where the customers in those areas turn for dredging services.

The Court found that at a final injunctive hearing, it was likely that the evidence would establish that generally customers on the East Coast turn to dredging companies on the East Coast for services. It should be noted that the evidence presented on this point was not very extensive and the Court

hopes that more detailed information will be presented at the final hearing. Nevertheless, Mr. Victor Beardsley Hertslet, Vice President of Arundel Corporation, a corporation that often employs dredging firms, did give testimony on this question. He testified that firms that compete in the Gulf Coast states do not generally compete on the East Coast and usually only East Coast firms compete for East Coast work. N.T. 3–159. Gulf Coast firms apparently do not compete for business on the East Coast because they have sufficient work in the Gulf states and labor is cheaper in that region. N.T. 3–161 to 3–163. As Mr. Hertslet's testimony was uncontradicted, the Court concluded that the supply of dredging contractors for East Coast customers was limited to those contractors operating on the East Coast.

Having determined that the East Coast was a relevant geographic market that possibly could be affected by Weeks' acquisition of American stock, the question arose as to whether more narrowly defined geographic areas should be designated as relevant geographic markets. American argued that local areas, especially the New York-New Jersey harbor and vicinity and Jacksonville, Florida, were relevant geographic markets; American contended that customers in these areas were confined to their local harbors for obtaining dredging services. The Court could not agree. The economic reality appeared to be that customers in East Coast local areas have the opportunity to be serviced by dredging companies operating on the entire East Coast and not just those operating in their own local harbors. Mr. William J. McPhillips, Vice President of Weeks, prepared certain charts about the dredging business. Weeks Exhibit 21 listed the fourteen principal dredging companies in the United States and indicated the areas in which these companies operated. Weeks Exhibit 22 listed the fourteen principal dredging companies in the New York-New Jersey area and their areas of operation. Of the fourteen principal dredging companies in the United States, thirteen operate on the East Coast and of these thirteen, eight were listed as principal dredging companies in the New

York-New Jersey area. This evidence would tend to indicate that consumers in the New York-New Jersey area are supplied by most of the principal dredging companies on the East Coast. Furthermore, the list of the principal dredging companies in the New York-New Jersey area indicated that twelve of the fourteen dredging companies listed operate along the entire East Coast. As mentioned earlier, the Army Corps of Engineers is the largest customer of dredging services. American submitted the Corps' Abstracts of Bids in the New York-New Jersey harbor and vicinity from 1975 to 1976 and also the Corps' Abstract of Bids for the Jacksonville, Florida area from October 1, 1974, through 1977. American Exs. 27, 28. These abstracts supplied the Court with very important information. Of the thirteen principal dredging companies in the United States listed on Weeks Exhibit 21 as operating on the East Coast, eight of these companies had bid on Corps contracts to be performed in the New York-New Jersey harbor and vicinity. These eight companies had placed seventy-four of the eighty-five bids that the Corps received on its New York-New Jersey harbor contracts and these eight companies won twenty-one out of the twenty-four contract awards granted by the Corps. American Ex. 27; Weeks Ex. 21. In the Jacksonville, Florida area, of the thirteen principal dredging companies shown as operating in the East Coast in Weeks Exhibit 21, nine bid on Corps contracts in the Jacksonville area. Twenty four of the sixty two bids received by the Corps for its jobs in the Jacksonville area came from these nine companies and seven of the fourteen Corps contracts were awarded to these nine companies. This evidence reflected that both in the Jacksonville area and the New York-New Jersey area a substantial number of the bids placed and contracts won were submitted by the principal companies operating throughout the East Coast. But perhaps the more significant data was revealed when the Court compared the companies bidding on New York Corps jobs with the companies bidding on Jacksonville Corps jobs. Of those eight principal dredging companies bidding on contracts in the New

York-New Jersey area, seven were the same as the principal dredging companies bidding on Corps contracts in Jacksonville. American Exs. 27, 28. Furthermore, when the Court compared the list of dredging companies bidding on Corps contracts in New York with the list bidding on Corps contracts in Jacksonville, it discovered that nine of the fifteen companies bidding in New York were the same as those bidding in Jacksonville. All this evidence taken together indicated to the Court that American's argument that customers in local areas were confined to their local harbors for dredging services was incorrect, and that, in fact, customers who wished to have dredging operations performed in any local area could look to those suppliers who operated on the entire East Coast.

The opinion testimony given at the hearing, tended to substantiate these conclusions. Mr. McPhillips testified that the dredging business was fully mobile; dredging companies move where the work is and are not limited to one port or harbor. N.T. 3–179. Similarly, Mr. Hertslet explained while in every harbor you might find one or two dredging companies that do most of their work in that harbor, companies on the East Coast generally compete for jobs up and down the Atlantic coastline. N.T. 3–160.

American supported its position by presenting testimony on the mobilization costs involved in moving a dredge from one port to another. American claimed that such prohibitive costs made it impossible for companies to supply more than one locality. As dredges are generally not self-propelled and must be transported by tug boats, there are costs which a dredging company must incur if it is to move its equipment. In certain situations, where the remuneration for the job is very small and the distance to the job is very far so that mobilization costs are extremely high, such mobilization costs might prevent a dredging company from competing for a job. However, no evidence was presented on how frequently this occurs in the dredging business nor did the evidence presented indicate that these costs caused dredging companies from generally being mobile. The information supplied by the Army Corps of Engineers and by the expert witnesses tended to show that dredging companies move up and down the East Coast where they compete for jobs. In fact, American's business operations throughout the East and Gulf Coast reveals the mobility characteristic of the dredging business.

Unlike the case of some service industries, the proximity of the dredging contractor's main stations does not seem to be important to dredging customers. Whoever supplies the lowest bid gets the job. Dividing the East Coast into small localities each constituting a separate and distinct geographic market would ignore economic realities. As dredging contractors compete for work all over the East Coast and customers are supplied with bids by contractors from all over that Coast, there appears to be no justification for designating the relevant geographic markets by localities. *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *United States v. Hammermill Paper Co.*, 429 F.Supp. 1271 (W.D.Pa.1977). Therefore, the Court concluded that the evidence presented at the hearing established that the only relevant geographic market for antitrust purposes was the East Coast.[2]

### C. *The Acquisition's Effect on Competition*

■ To determine whether Weeks' acquisition of American would produce anticompetitive effects in the East Coast bucket dredging market, the Court looked at several factors which generally reveal the effect of an acquisition on competition. The primary indicator of anticompetitive effects is market share. *United States v.*

---

**2.** Although American competed on the Gulf Coast for dredging jobs, the Gulf Coast was not considered as a relevant geographic market. The testimony presented showed that almost all work performed on the Gulf Coast was hydraulic dredging. As hydraulic dredging had been determined not to be a relevant line of commerce, the Gulf Coast could not be designated a relevant geographic area. In addition, the testimony presented established that Weeks did not compete in the Gulf Coast.

*Mrs. Smith's Pie Co.,* 440 F.Supp. 220 (E.D. Pa.1976). As the Supreme Court stated in *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), "[t]he market share which companies may control by [acquisition] is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market." 370 U.S. at 342, 82 S.Ct. at 1534. However, the evidence presented on market share was not very extensive. Weeks introduced an exhibit which estimated the percentage of the combined East Coast and Gulf Coast market shares of American and Weeks. Weeks Ex. 23. This estimation was based on a comparison of each company's operating revenues with the estimated annual revenues in the entire dredging business in the combined East and Gulf Coast areas. The estimation of the annual revenues for the East and Gulf Coast areas was based on information obtained from an annual report of the National Association of Dredging contractors and a study of the dredging business performed by A. D. Little Company at the direction of Congress. American Ex. 23. Weeks' exhibit reflected that in 1975, American earned 8.1% of the total annual dredging revenues in the East and Gulf Coasts and that Weeks earned 2.4% of these revenues; in 1977, American earned 6.7% of the dredging revenues in these areas, and Weeks earned 2.1% of these revenues. There were two problems with using these figures to estimate market share; the exhibit reflected revenues in the combined East and Gulf Coasts and in this area's entire dredging business. As East Coast revenues for bucket dredging were not isolated by this exhibit, the utility of this exhibit in determining both Weeks' and American's market shares in the East Coast bucket dredging industry was greatly diminished. Having only engaged in bucket dredging on the East Coast which has less revenues than the Gulf Coast, it is reasonable to assume that Weeks' share of the East Coast's bucket dredging revenues was somewhat greater than the exhibit reflected. Thus, these facts had to be considered in determining the weight given to the market share evidence. American introduced no other evidence of market share in the East Coast's dredging business, and, therefore, Weeks' exhibit was all that the Court had to consider on this point. It tended to show that the acquisition by Weeks of American would not result in a very significant increase in the market share controlled by one company.

Given the somewhat uninformative evidence presented on market share, the Court felt compelled to search the record to see if American had shown other indications of anticompetitive effects. Price fixing is a relevant consideration in making a Section 7 determination, and so the Court looked for evidence on this point. *Brown Shoe v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The Court found, though, that the evidence showed that dredging companies have a limited ability to engage in overt price fixing. Unlike other industries where companies disclose the prices for their products, bids on dredging contracts are generally made on a sealed basis, without consultation between firms. N.T. 3–179. And as there was no evidence of covert price fixing, the price fixing indicator of anticompetitive effects appeared to be negative.

The Court also looked to such factors as new competition in the market, number of firms competing in the market and apparent present competition in the market. While the evidence revealed that there might have been one or two new entrants into the East Coast bucket dredging industry, the A. D. Little study which was performed for Congress indicated that there was a 44% decrease between 1964 and 1972 in the number of firms bidding on dredging contracts on the East Coast. The study concluded that this decrease was a result of a decline in the volume of work available in the market and that this decline in volume was causing firms to leave the dredging industry on the East Coast. American Ex. 23. The study also reflected that the largest number of firms competing in any one region in the nation was the East Coast; this was true even though the East Coast did not produce the greatest dredging revenues. American Ex. 23.

**494**

Other testimony also indicated that the decrease in number of dredging firms operating on the East Coast was due to the lack of work available on the East Coast and not a result of consolidation of companies. Mr. Hertslet, the expert witness presented by American, testified that the amount of work available on the East Coast had decreased over the years. N.T. 3–161. And Mr. Greaser, President of American, testified at his deposition that, while there had been a decline in the number of dredging companies on the East Coast, this was mainly a result of companies going broke and disposing of their equipment as best they could. Greaser, Dep. at 140. In fact, he did not know of any company that had been acquired by another. Greaser Dep. at 144. As to present competition, the testimony supported the proposition that competition in the East Coast's bucket dredging business was intense. N.T. 3–137; 3–165. All of the evidence presented on these factors indicated to the Court that, while the number of dredging contractors operating in the East Coast area had decreased, this decrease was due to the lack of work available and not a result of firms attempting to create monopolies. Furthermore, among the number of dredging contractors remaining, which was the largest number in any one region in the United States, there appeared to be intense competition for the limited amount of work available.

At the preliminary injunction hearing, the only evidence presented which would tend to support American's claim was on the decreasing number of firms involved in the East Coast dredging business. However, that evidence, standing alone and in light of the fact that the decrease was due to a lessening in demand for dredging services on the East Coast, was insufficient to allow the Court to find a reasonable likelihood that American would succeed on its antitrust claim. Given that the acquisition of American by Weeks did not appear to result in a large part of the market share being monopolized by one company and that the East Coast bucket dredging market appeared to be characterized by intense competition and a lack of price fixing, the Court could not find a reasonable likelihood

that Weeks' acquisition would tend substantially to lessen bucket dredging competition on the East Coast. Therefore, while the possibility always remains that American will be able to prove at trial that Weeks has violated the antitrust laws, insufficient evidence was presented at the hearing to allow this Court to grant American's request for preliminary injunctive relief on its antitrust claim.