SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

TEXAS INTERNATIONAL
COMPANY, Defendant.

No. 78 C 847.

United States District Court,
N. D. Illinois, E. D.

Sept. 30, 1980.

Ronald P. Kane, Dennis B. O'Boyle, Securities and Exchange Commission, Chicago, Ill., for plaintiff.

John J. Enright, Jeffrey R. Liebman, Arvey, Hodes, Costello & Burman, Chicago, Ill., Daniel S. Greenfeld, Marshall, Bratter, Greene, Allison & Tucker, New York City, for defendant.

## MEMORANDUM DECISION

MARSHALL, District Judge.

This case involves the application of two complex sets of statutes. The first is Chapter X of the Bankruptcy Act, 11 U.S.C. §§ 501–676, relating to the reorganization of a corporate debtor so that its stockholders and creditors receive fair consideration of their claims and so that it emerges from the bankruptcy proceedings as a revitalized corporation with a sound financial structure; the second is the reporting and antifraud sections of the federal securities acts, which are designed to regulate the issuance and acquisition of securities so that investors can make realistic and informed investment decisions. The interaction between these statutes is created by a rather labyrinthian factual setting.

To give a brief outline, King Resources Corporation (KRC) received approval for a plan of reorganization which offered new securities in settlement of its indebtedness. Under the plan, claims held by certain of KRC's shareholders were exchangeable for new securities in the reorganized corporation. Before the securities were issued, and before the reorganized corporation became fully operational, Texas International Company (TI) made a take–over bid for the reorganized KRC. To effectuate its plan, TI offered to purchase the claims of the KRC shareholders. A large number of shareholders accepted the offer. The Securities and Exchange Commission (SEC) brought this action seeking an injunction against TI, contending that the TI offer violated the reporting and antifraud provisions of the securities laws. Among other things, the action raises the novel legal issue of whether an offer to purchase the claims of creditors in a reorganzation proceeding can qualify as a tender offer within the scope of the Williams Act, 15 U.S.C. §§ 78m(d)–(e), n(d)–(f).

Although KRC is not a party to the present action, an examination of its recent financial history is essential to an understanding of the current litigation.

KRC and its predecessors have been engaged in the exploration for, and production of, oil and gas. Its principal assets are producing and developing properties in the United States and Canada. In early 1971, after attempting a major business expansion, KRC found itself short on working capital and cash. As a result, KRC could not make the payments on $20 million of bank debt, and $40 million of its debentures. (SEC 2d Advis. Report, pp. 3–4).

On August 14, 1971, an involuntary petition for reorganization under Chapter X was filed against KRC in the United States District Court for the District of Colorado (reorganization court). Exercising its bankruptcy powers, that court appointed a trustee to take charge of KRC's assets and manage the business. The trustee soon be-

gan the tasks of selling unprofitable operations, and of working on a plan to restructure and revitalize KRC's debt and capital.

A corporate reorganization necessitates a probing examination of broad economic, legal, financial and business issues, including analysis of market conditions, appraisal of the debtor's managerial expertise, prediction of future earnings, and determination of proper financial structures. To resolve these problems, the Bankruptcy Act contemplates frequent resort to the expertise of the SEC. *See* Hooton, *The Role of the Securities and Exchange Commission under Chapter X, Chapter XI and Proposed Amendments to the Bankruptcy Act*, 18 Boston Coll.Ind. & Comm.L.Rev. 427, 428 (1977). Thus, copies of all Chapter X petitions, as well as all notices mailed to creditors, must be sent to the SEC. 11 U.S.C. § 665(a). If the SEC feels the proceedings affect substantial public investor interest, it may ask to intervene in the case. 11 U.S.C. § 608; 40 SEC Ann.Rep. 123 (1974); Hooton, *supra* at 430. The SEC did intervene in the KRC proceedings.

Once it intervenes in a case, the SEC serves primarily an advisory function. It has no authority to hold hearings, decide issues or approve plans of reorganization. The trustee has the primary responsibility for the preparation of a plan, and the judge of the reorganization court has sole responsibility for its ultimate approval. The SEC's main function "is to act as an impartial representative of public investors and to provide expert assistance to the court." Hooton, *supra* at 440, 429. If the corporation's scheduled indebtedness exceeds $3,000,000, the reorganization court must submit the proposed plan of reorganization to the SEC for an advisory report. 11 U.S.C. § 572. However, the SEC is likely to file a formal advisory report "only in a case which involves substantial public investor interest and presents significant problems." 40 SEC Ann.Rep. 127 (1974); Hooton, *supra* at 441. In the present case, the SEC prepared two advisory reports which were submitted to the reorganization court.

The goal of a debtor relief proceeding under Chapter X is to confirm a plan of reorganization that settles the rights of creditors and stockholders who will participate in the new company. Corotto, *SEC Reporting, Proxy and Antifraud Compliance—An Additional Perspective on Bankruptcy Reorganization Proceedings*, 63 Calif.L.Rev. 1563, 1577 (1975). After seven years of proceedings in the reorganization court and the rejection of several proposed plans, the trustee finally secured acceptance for a plan for KRC in 1977. After receiving an advisory report on the plan from the SEC the reorganization court approved the plan in May, 1977. At that time, the court found that KRC was insolvent, i. e., that its liabilities exceeded its assets. Because the general creditors must receive full satisfaction before stockholders may participate in a plan, *see Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941), this finding of insolvency had the practical effect of eliminating KRC stockholders from the plan, and from voting thereon. All shares of KRC common stock would be cancelled under the plan. After judicial approval, the plan was submitted to KRC creditors for their acceptance. The requisite number of acceptances were received, and the reorganization court confirmed the plan on October 7, 1977.

A partial description of the plan is required so that we may identify two classes of creditors that have a bearing on the present case, and so that we may understand the securities law problems in this case in the context of the capital structure of the reorganized company.

The plan provided for the continuation of KRC's business by an essentially debt–free reorganized company, renamed Phoenix Resources Company. Under the plan, the allowed claims of all creditors of KRC totalled $95.3 million. Of those claims, $7.1 million were to be paid in full in cash. The remaining $88.2 million of claims were to be discharged by the distribution of new stock in the reorganized company. Two classes of Phoenix stock, A and B, were to be issued to the creditors. Class A shares would have certain preferred rights over

Class B shares. Specifically, each Class A share would be convertible into 1½ Class B shares during the first year after confirmation of the plan, and into 1¼ Class B shares during the second year after confirmation. Class B shares would not be convertible.

To recognize the varying priorities of the different classes of KRC creditors, the plan contemplated a distribution of different numbers of shares of Class A and B stock to each group of creditors. Thus, senior creditors would receive 50 shares of Class A stock for each $1,000 of allowed claims. Debenture holders would receive approximately 8 shares of Class A stock and 42 shares of Class B stock for each $1,000 of allowed claims. General unsecured creditors would receive 25 shares of Class A stock and 25 shares of Class B stock for each $1,000 of allowed claims.

Included in the general unsecured creditors were a particular class of KRC shareholders and debenture holders. In September, 1971 these security owners had filed a class action lawsuit against KRC, charging it with having conducted fraudulent securities transactions. (*Dietrich v. King Resources Co.*). The action sought damages of more than $100 million and included more than 20,000 claimants. To avoid a costly and lengthy trial, the reorganization trustee settled these claims for $13 million in 1975. As a result of the settlement, the Dietrich class members were entitled to participate in the plan of reorganization of KRC as general unsecured creditors. It is clear that the basis of their participation was the fraud settlement and not their stock as such; nevertheless their status as stock and debenture holders in KRC was an essential ingredient of their settled fraud claim.

The Dietrich class members and the senior creditors play a prominent role in the financial maneuvers leading to the present litigation. In addition, the value, character and distribution of the new Phoenix stock has important ramifications for the application of the securities laws in this case.

Before reaching those issues, however, we must introduce another corporation into the picture—Texas International Company (TI), which is the defendant in the present action. TI is a Texas–based corporation engaged in the manufacture of oil field equipment, the provision of oil field services and the exploration for and production of crude oil and natural gas. It has adopted a continuing program of acquiring companies in the oil and gas exploration and production industry. In late 1977 TI decided to attempt to obtain control of KRC and to ultimately effect a merger of the two companies. Its preliminary "take–overtures" were directed at two groups of KRC creditors—the senior creditors and the Dietrich class members.

On August 3, 1977, about two months after approval of the plan of reorganization and two months prior to its final confirmation, TI made an offer to purchase for cash the allowed claims of certain "eligible creditors." Eligible creditors were defined to include the $29 million in claims held by about 12 senior creditors, and $4 million in claims held by about 1,300 "trade creditors." Trade creditors were defined as a special group of unsecured general creditors, and did not include the Dietrich class members. The offering price was $0.90 for each $1.00 of allowed claims, but the offer was subsequently raised to $1.02 on the dollar after negotiations between TI and the eligible creditors. The soliciting materials gave detailed information on the terms of the offer, the method of acceptance and payment, information about TI and KRC, and TI's purpose in making the offer. TI's announced objective was ". . . to acquire all Allowed Claims of all Eligible Creditors as a preliminary step to obtaining control of KRC and, perhaps, consummating a merger of KRC into or the combination of KRC with, TI." As a result of its offer, TI acquired $30.8 million of the targeted $33 million of claims of senior and trade creditors.

TI's second "take–overture" was made on or about December 21, 1977, about two months after the confirmation of the plan. At that time, TI made an offer to purchase for cash the $13 million in claims held by the Dietrich class members. The offering price was $0.86 for each $1.00 of allowed

claims. As before, the soliciting materials gave detailed information on the terms of the offer, the method of acceptance and payment, information about TI and KRC, and TI's purpose in making the offer. TI repeated its intentions of taking over KRC and effecting a merger of the two companies. In addition, the materials described the status of the reorganization proceedings, the structure and terms of the plan of reorganization, and TI's prior offer to senior and trade creditors. As a result of its offer, TI acquired about $4.4 million of the $13 million of claims of the Dietrich class members.

As a consequence of its two offers, TI acquired about $35.2 million of the $95.3 million in total allowed claims. Under the plan of reorganization, its purchases were convertible into about 44% of the Class B stock to be issued, which is somewhat less than majority ownership.[1] Pursuant to reorganization court authorization, the trustee began issuing Phoenix stock in exchange for claims of creditors on January 27, 1978.

On March 7, 1978, the SEC filed the present action for injunctive and equitable relief against TI. It alleged that TI's offer to the Dietrich class members violated sections 10(b), 14(d) and 14(e) of the Securities Exchange Act, as amended, 15 U.S.C. §§ 78j(b), 78n(d) and 78n(e), and Rules 10b–5 and 14d–1, 17 C.F.R. §§ 240.10b–5 and 240.14d–1, promulgated thereunder. The SEC's charges are separated into three counts, but may be conveniently divided into two broad allegations: 1) that TI failed to file a report with the SEC describing its offer to the Dietrich class, as required by section 14(d) of the Exchange Act (Count 3) and 2) that TI's offering materials to the Dietrich class contained statements and omissions which fall short of the disclosure standards set forth in the anti–fraud sections of the Exchange Act (Counts 1 and 2).

There are pending for decision the SEC's motion for a preliminary injunction pursuant to Rule 65, F.R.Civ.P., the SEC's motion for summary judgment on Counts 1 and 2 pursuant to Rule 56, F.R.Civ.P., TI's motion to dismiss Count 3 and its cross–motion for summary judgment on Counts 1 and 2.

### I. *The Section 14(d) Claim*

The SEC's claim which alleges a violation of the filing requirements of the federal securities laws, rests on an unusual construction of the Williams Act, amendments to the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(d)–(e), n(d)–(f). Those amendments were designed to ensure the disclosure to investors of material facts concerning the identity, background and plans of the person or group which makes a cash take–over bid or other acquisition that may cause a shift in control of a corporation. To implement this objective, section 14(d) of the Act provides that any person making "a tender offer for . . . any class of any equity security which is registered pursuant to" section 12(g) of the Act, 15 U.S.C. § 78*l*(g), must file a statement with the SEC, if the person would be the beneficial owner of more than 5% of the securities after the tender offer is completed.

The SEC alleges that TI's offer to purchase the reorganization claims of the Dietrich class members satisfied the requirements for 1) a tender offer 2) for a class of equity security 3) which is registered under § 12(g) of the Act and 4) more than 5% of which would be beneficially owned by TI after the offer. Thus the SEC contends that although TI offered to purchase the creditor claims in bankruptcy of the former KRC security holders, those claims should be regarded as the equivalent of an equity security, since the plan of reorganization made the claims readily exchangeable into shares of Phoenix stock which clearly qualify as an equity security. Next, the Phoenix equity security fulfilled the registration requirement of § 14(d) for either of two reasons. First, the Phoenix stock was a "successor security" to the common stock and convertible debentures of KRC, which had been registered under § 12(g) of the Act. Phoenix is essentially the same corporation

---

1. On March 24, 1978, TI advised Phoenix that it had acquired more than half of Phoenix's stock, apparently as a result of additional stock purchases. (SEC Reply Mem., Exh. 1).

as KRC; it is the same reorganized business under a new name. Therefore, the Phoenix stock should be "deemed registered" under § 12(g) as of the date of confirmation of the plan of reorganization, which was some two months before TI's tender offer. Alternatively, the SEC contends that the Phoenix stock should be "deemed registered" pursuant to its Rule 12g–3(a) which implements § 12(g). The rule requires a continuity of compliance with § 12(g) when a corporation undergoes certain fundamental business changes. It provides that when securities not previously registered are issued during such fundamental business changes in exchange for registered securities of another issuer, the new securities shall be "deemed registered" under § 12(g). The fundamental business changes are defined as "a succession by merger, consolidation, exchange of securities or acquisition of assets." The SEC contends that the KRC reorganization had the same net effect as a merger or consolidation. It also argues that the Dietrich class members effectively experienced an "exchange of securities," since their ownership rights in KRC securities became creditor claims in the reorganization proceeding and in turn became exchangeable for Phoenix stock under the plan. Finally, to fulfill the "beneficial ownership" requirement of § 14(d), the SEC urges that TI's purchase of the Dietrich members' claims can be equated with beneficial ownership of Phoenix stock, because after TI's offer was accepted the only missing incident of ownership was the actual possession of Phoenix stock certificates. The formula for converting claims to shares was settled when the plan was confirmed, and the issuance of the Phoenix shares under the plan in the very near future was an almost certain eventuality.

TI has moved to dismiss the SEC's § 14(d) claim, contending that none of the prerequisites to a § 14(d) action are present here. The SEC in turn has moved for summary judgment on this claim, since TI admittedly

failed to file any statement with the SEC concerning its offer to the Dietrich class members. For the reasons now stated we deny TI's motion to dismiss and grant the SEC's motion for summary judgment on this claim (Count 3).[2]

The first question is whether TI's offer to purchase the claims in bankruptcy held by the Dietrich class members qualifies as a "tender offer" within the meaning of § 14(d) of the Williams Act. Neither Congress nor the SEC has defined the term. Its meaning develops on a case–by–case basis. *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 596–98 (5th Cir. 1974). In conventional understanding, a tender offer is a public invitation addressed to all shareholders of a corporation to tender their shares for a specified price. Typically, the offer is open for a limited time, the price is set at a premium above the current market price, and the offer is conditioned upon the receipt of a stated number of shares. Note, *The Developing Meaning of "Tender Offer" under the Securities Exchange Act of 1934*, 86 Harv.L.Rev. 1250, 1251–52 (1973). Most courts and commentators have agreed that the definition should be extended beyond its conventional meaning, and should encompass offers which are likely to pressure shareholders into making uninformed, ill–considered decisions to sell. Note, *supra*; *Nachman Corp. v. Halfred*, CCH Fed.Sec. Rep., ¶ 94,455 (N.D.Ill. July 13, 1973); *Cattlemen's Investment Corp. v. Fears*, 343 F.Supp. 1248 (N.D.Okla.1972). In formulating this definition, courts have applied a method of statutory construction by which borderline or "unorthodox" transactions are included within the broad statutory definition if they may serve as a vehicle for the evil which Congress sought to prevent. *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593–94, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973) (applying this method to the meaning of "purchase" and "sale" under § 16(b) of the Exchange Act).

---

**2.** In reaching the result we do with respect to this aspect of the case we acknowledge that we differ with the conclusions reached by Hon. Luther E. Eubanks in *Lipper v. Texas Interna-* tional Company, No. 78–0215E, (D.W.D.Okla. 1979), a private action brought by a member of the Dietrich class alleging, *inter alia*, violations of the Williams Act by TI.

⬛ TI's offer had many characteristics of a conventional tender offer, and also had characteristics which satisfy the evolving judicial standard which implements Congressional intent. The method of solicitation used was a public invitation to all members of a well–defined class of claim holders in a publicly–held company. There were no ordinary market transactions where an investor takes the initiative and steps forward to sell on his own. Note, *supra* at 1279; *Kennecott Copper Corp. v. Curtiss–Wright Corp.*, 449 F.Supp. 951, 961–62 (S.D.N.Y.1978). The offer was made by an outside corporation which intended to gain control of KRC. The offer was directed at a large number of solicitees, over 20,000, and therefore had a widespread impact on the investing public. *See* Aranow, Einhorn & Berlstein, *Developments in Tender Offers for Corporate Control*, 4–6 (1977). The Dietrich class members held claims representing about 15% of the corporation's assets. The offer was for a fixed price, specified in advance. The offer was not conditioned upon the tender of a specified number of shares. It is difficult to tell whether the price included a premium above the current market price which might have pressured the Dietrich claim holders into quick selling. The reorganization court valued KRC as a going concern at between $90–100 million, and the total value of claims in reorganization was $95.3 million. The offer was for $0.86 per $1.00 of claim. Assuming these claims were fully converted into Class B stock of Phoenix, the offer was worth $13.77 per share. At the time of the offer, the unissued Phoenix stock was being traded in the over–the–counter market on a "when, as and if issued" basis. The market "bid" price stood at around $17½ per share. No regular market for the stock existed. Despite this uncertainty about the precise value of the TI offer and the absence of a first–come, first–served condition on the offer, the Dietrich claim holders could easily have been pressured into a hasty investment decision by the two–week time limit contained in the offer. Viewed in its totality, and in light of the purposes of the Williams Act, we hold that the TI offer qualifies as a "tender offer" within the meaning of § 14(d).

⬛ The second question is whether TI's tender offer was made for an "equity security." By its terms, the TI offer to the Dietrich class claim holders was for "interests in the [Dietrich] class settlement fund." It is undisputed that such "interests," viewed in isolation, could not qualify as an "equity security," as that term is defined in section 3(a)(11) of the Exchange Act. 15 U.S.C. § 78c(a)(11). However, the SEC argues that substance rather than form should control, and that the substance of TI's offer was for the Phoenix stock into which the "interests" were exchangeable. Clearly the Phoenix stock would qualify as an equity security, since the statutory definition covers "any stock or similar security."

We agree with the SEC position. The principles of construction which have been applied to the definition of a "security" under section 3(a)(10) are equally applicable to the definition of an "equity security" under section 3(a)(11). Thus, it is clear that these definitions "embod[y] a flexible rather than a static principle," *SEC v. Howey*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), and that in searching for the meaning "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Hirk v. Agri–Research Council, Inc.*, 561 F.2d 96, 99–100 (7th Cir. 1977). In its solicitation materials to the Dietrich class members, TI describes an economic reality which clearly contemplates the issuance of Phoenix stock for the purchased interests. The materials frequently state that if the plan of reorganization is consummated, Phoenix stock would be distributed to the Dietrich class members. Although TI attempts to make much of pending appeals and the complexity of the reorganization proceedings to demonstrate "substantial uncertainty" regarding the actual consummation of the plan, its solicitation materials indicate that issuance of the stock was quite probable:

"While the distribution of shares of New King Stock pursuant to the Plan is subject to consummation of the Plan and the related motions and appeals described under Section 6 below, *the Trustee has indicated that he intends to consummate the Plan during January 1978*, if the proceedings are not delayed by a stay of consummation by judicial order."

While there were several stay–related motions which were before the reorganization court and which were clustered closely in time around the December 1977 tender offer, they do not seriously weaken the probabilities of imminent issuance of the Phoenix stock. Despite those motions, the reorganization court entered an order authorizing the issuance of the Phoenix stock on January 6, 1978, the day TI's tender offer terminated. The trustee began issuing Phoenix stock some 21 days later. Although our post–tender offer hindsight gives us a clearer picture of the probabilities than may have been apparent in December 1977, the contemporaneous expressions by TI in its tender offer display similar expectations. Indeed, the offer included a clause which provided that if the trustee began issuing stock "during the pendency of the Offer ..., payment for any Interests tendered will be made only against receipt of certificates evidencing the shares distributed ..." and "[t]he certificates must be accompanied by duly executed stock powers ..." Finally, there is no doubt that, in TI's own words, its "objective in making the Offer is to acquire all the [Phoenix] Stock to be issued to the Class Settlement Fund ..." Given the pragmatic economic reality that the Dietrich claims and the Phoenix stock were wedded in both a temporal and a conceptual sense, we conclude that TI's offer was made for an "equity security" under § 14(d).

The third question under § 14(d) is whether TI's tender offer was made for an equity security which was registered under section 12(g) of the Exchange Act. It is here that TI wages its most vociferous defensive battle. It argues that no targeted security was registered under 12(g) at any time before or during the offering period, and that the SEC effectively admitted this fact by its conduct in early 1978 when it recommended that Phoenix file certain forms for the registration of the Phoenix stock.

At the outset, we set forth the pertinent facts and statutes on this issue in somewhat greater detail. Section 12(g) of the Exchange Act provides that every issuer engaged in interstate commerce or whose securities are traded by use of the mails or any means or instrumentality of interstate commerce, which has total assets exceeding $1,000,000 and a class of "equity security" held of record by 500 or more persons, must register that security with the SEC by filing a registration statement that contains such information and documents as the SEC may specify. 15 U.S.C. § 78*l*(g)(1)(B). This provision applied to KRC when it entered the Chapter X proceedings. As a large, publicly–held corporation with sizeable assets, it had two classes of equity securities registered under § 12(g): common stock and convertible debentures. These securities were section 12(g) securities until at least October 7, 1977 when the plan of reorganization was confirmed. Once KRC's securities were registered under § 12(g), it became a reporting company and thereafter was required by law to file current and periodic reports with the SEC pursuant to § 13(a) of the Exchange Act, 15 U.S.C. § 78m. Those reporting requirements ordinarily remain in force despite the onset of reorganization proceedings, since trading in a debtor's securities usually continues during reorganization. Corotto, *supra* at 1568 n.17, 1574–75. Although public financial reports reveal that KRC's stock was being traded in the over–the–counter market in late 1973 at around 20¢ per share, we have found no information indicating a subsequent market in the securities.

KRC filed a Form 8–K with the SEC on August 8, 1977, reporting the submission of the plan to the creditors for their vote and TI's offer to purchase the claims of the senior creditors. (Ponzio Exh. 3). A Form 8–K is the report form used to keep the § 12(g) registration current. Corotto, *supra* at 1573 n.37.

On October 7, 1977 the reorganization court confirmed the plan of reorganization. Under the plan, all outstanding shares of common stock were to be cancelled. The outstanding KRC convertible debentures were allowed as general unsecured claims against KRC, and were to be satisfied by the issuance of Phoenix stock. All KRC shareholders as shareholders would be excluded from participation in the plan. However, those shareholders who qualified as creditors under the terms of the Dietrich settlement would be entitled to receive shares of the new Phoenix stock to be issued under the plan. Because the Phoenix stock would be issued under a confirmed plan "in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash," it was arguably exempt from the registration requirement of § 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e(c), by virtue of section 3(a)(10) of that Act, 15 U.S.C. § 77c(a)(10), or by virtue of section 264 of Chapter X of the Bankruptcy Act, 11 U.S.C. § 664(a)(2). Securities Act Release No. 33–3343, May 24, 1949, CCH Sec. Law Rep. ¶ 2,197. Those sections operate on the assumption that the judicial scrutiny provided during the approval and fairness hearings in reorganization proceedings are an adequate substitute for the normal SEC oversight of such transactions. *See* Note, 51 Amer. Bankruptcy Law Journal 99 (1977); 6A *Collier on Bankruptcy* ¶ 15.05 at 1196 (14th ed. 1972). Upon entry of the confirmation order, brokers or dealers became legally entitled to sell the new Phoenix securities on a "when, as and if issued" basis.[3] Securities Act Release No. 33–3343, *supra.* That trading occurred in an over-the-counter market, and was active at the time TI made its tender offer in December, 1977. At that time, under the plan, Phoenix was a company engaged in a business affecting interstate commerce and had assets valued in excess of $1,000,000. In addition, it had more than 500 holders of a previously registered security who had a right to sell the unissued Phoenix securities. Those holders included the Dietrich class members.

Since the reorganization court's confirmation of the plan, KRC has continued to file periodic reports with the SEC under § 13(a) of the Exchange Act, presumably to keep its § 12(g) registration current. It filed a current report on Form 8–K on October 28, 1977 and a quarterly report on Form 10–Q on November 17, 1977. It filed another 8–K under its successor company name of Phoenix Resources on January 12, 1978, some six days after the termination of the TI tender offer. On February 16, 1978, on the SEC's recommendation, Phoenix filed a Form 8–A seeking registration of its Class A and Class B common stock. A Form 8–A is used to obtain initial registration of securities not previously registered or deemed registered under § 12 of the Exchange Act. Some two months later, on March 31, 1978 and again on the SEC's recommendation, Phoenix withdrew the Form 8–A and substituted a Form 8–K in its place. A Form 8–K assumes that the security is already registered or deemed registered. Then on June 16, 1978, Phoenix filed a second Form 8–A application for registration of its common stock, which the SEC deemed as unnecessary because the Phoenix stock was already considered to be registered under § 12(g).

We now must apply to these facts the two theories of successor registration espoused by the SEC. First, the SEC argues that the Phoenix stock should be "deemed registered" under § 12(g) of the Exchange Act because: the KRC securities were registered under that section; after confirmation of the plan, the shareholders, assets and business of KRC were transferred to Phoenix, which is in essence the same corporation under a new name; under the plan, the Dietrich class members simply ex-

---

**3.** "Most trading is conducted on the basis of 'regular way contracts' which require settlement and delivery of the certificates no longer than the fifth business day after the transaction. 'When, as and if issued' trading refers to transactions in shares that have not been formally issued, and, accordingly, settlement is contingent on later issuance of the stock." *SEC v. Coven*, 581 F.2d 1020, 1024 n.7 (2d Cir. 1978).

changed their old KRC securities for the new Phoenix securities; the Phoenix stock succeeded to the KRC common stock and convertible debentures which were already registered. To effectuate the Congressional intent to provide a continuous flow of information concerning publicly–held companies, the SEC urges the Phoenix stock must be deemed registered under § 12(g).

■ Although this theory has a pragmatic ring to it, there are several gaps in its logic. First, the Dietrich class members could not receive Phoenix stock in exchange for their old KRC securities, since those securities were cancelled or modified under the plan. Instead, they could only receive Phoenix stock in exchange for their creditor claims which arose from the settlement of their action for fraudulent securities transactions. Those fraud claims in turn arose from their ownership of KRC securities, so the conduit of exchange was an indirect one. Second, the similarities in financial structure between KRC and Phoenix are not necessarily probative of the fact that their respective securities are subject to identical registration obligations. Under § 12(g), a registration registers only a particular equity security, not the company generally.[4] Third, the new Phoenix stock was arguably exempt from the registration requirements of § 5(c) of the Securities Act of 1933. Consequently, continuous registration is difficult to accept as an objective fact.

■ Despite these problems, we agree with the SEC that the securities and bankruptcy laws were intended to provide an accurate and adequate flow of information to investors in large companies such as KRC and Phoenix. Section 12(g) was added by the Congress in 1964 as a means of extending disclosure obligations to a wider class of issuers of securities. Before this amendment, corporations with exchange–listed stock and those which floated new issues were subject to the registration, reporting, proxy solicitation and inside trading controls contained in sections 13, 14 and 16 of the Exchange Act. But the growing number of stocks in the over–the–counter (OTC) markets were outside the scope of these regulations. The purpose of section 12(g) was to extend the protections of sections 13, 14 and 16 of the Exchange Act to this important group of investors in OTC securities. *See* 109 Cong.Rec. 13725–26 (1963); 110 Cong.Rec. 17916, 17921 (1964). At the time of the TI tender offer, Phoenix had all the essential characteristics of companies which fell within the expanded orbit of section 12(g). It was a large company with interstate activities, sizeable assets exceeding $1 million, and many thousand public investors. It had securities which were being traded in an OTC market. And it was voluntarily updating its registration of its superceded KRC securities by filing reports with the SEC in October and November, 1977.

Furthermore, to permit the non–registration of the new Phoenix stock in December, 1977 to work an escape of the protective provisions of the Williams Act would allow TI to fall into the cracks of the securities laws simply because of the unorthodox nature of the issuance of securities in reorganization proceedings. The KRC securities owned by the Dietrich class were § 12(g) securities until at least October 7, 1977, when the KRC plan was confirmed. The replacement Phoenix stock issued in exchange for the claims of the Dietrich class became registered, or were re–registered, sometime in early 1978. Relying on a literal reading of the statute, TI urges that the old KRC securities and the new Phoenix securities lost their § 12(g) status in the interim and that its tender offer during that time escaped scrutiny under the Williams Act. Such a narrow construction of the statute would defeat Congressional objectives in providing full disclosure of corporate acquisitions to public investors. *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593–94, 93 S.Ct.

---

4. Under the Proposed ALI Federal Securities Code (March 15, 1978), registration of securities would be replaced by registration of companies themselves. See Introduction pp. xxv–xxvi, §§ 402–403.

1736, 1744, 36 L.Ed.2d 503 (1973). In addition, assuming an exemption of the Phoenix stock under § 3(a)(10) or § 264(a)(2), the alternative protective eye of the reorganization court was designed only to scrutinize the issuance of the new securities, not to examine the adequacy of disclosure in tender offers for those securities. It therefore fails to provide substitute protection for the Dietrich class.

The SEC's second theory of successor registration also provides support for a liberal construction of § 12(g). The theory is based upon the SEC's Rule 12g–3(a), which was promulgated pursuant to § 12(g). 17 C.F.R. § 240.12g3(a). The rule creates a continuity of registration for securities which are issued by companies undergoing certain fundamental business changes. It provides that:

> Where in connection with a succession by *merger*, consolidation, *exchange of securities* or acquisition of assets, equity securities of an issuer, not previously registered pursuant to Section 12 of the Act, are issued to the holders of *any class* of equity securities *of another issuer* which is registered pursuant to Section 12(g), the class of securities so issued shall be *deemed to be registered* pursuant to Section 12(g) of the Act unless upon consummation of the succession such class is exempt from such registration or all securities of such class are held of record by less than 300 persons. (emphasis added).

Although the transformation of securities which occurred under the plan does not fit clearly within the literal terms of a "merger" or an "exchange of assets," and Phoenix and KRC are realistically regarded as the same rather than as different "issuers," we do not believe that the unorthodox form of the business metamorphosis should be employed as a shield to evade the purpose and tenor of the rule. The TI tender offer, in its timing, falls within a unique and novel temporal and economic setting, but it is surrounded by the same dangers and need for investor protection which spurred the enactment of the rule. Although we share TI's concern that statutes and rules not be expanded so far beyond their literal terms that companies lose any clear guides for their business decisions, we believe that, in the particular circumstances of this case, TI's tender offer falls within the core concern of the Congress when it enacted the Williams Act. *See* S. Rep. No. 550, 90th Cong., 1st Sess. (1967); H.Rep. No. 1711, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 2811.

As its final defense on the registration issue, TI argues at some length that the SEC effectively admitted the fact that the Phoenix stock was unregistered at the time of the tender offer because of its subsequent conduct in recommending that certain filings be made. Thus, the SEC initially recommended to Phoenix that it file a Form 8–A for its new stock, the form used for previously unregistered stock. Four months later, and three days after filing the present complaint, the SEC advised Phoenix to withdraw the Form 8–A and file a Form 8–K in its place. The latter form is used to keep a previous registration up to date. From this evidence, TI argues that the SEC sought to eliminate evidence which supported TI's position, and to "manufacture" evidence tending to support the SEC's theory of successor registration. TI labels this conduct "a grave abuse of the public trust" and contends that it is an "admission" that the Phoenix stock was not registered or "deemed registered" in January, 1978 when TI's tender offer concluded. In response, the SEC has called its action in this regard "an interpretive mistake," has vigorously denied that any sinister motives were at work, and has moved to strike TI's arguments under Rule 12(f), F.R.Civ.P., as redundant, immaterial, impertinent and scandalous matter.

We agree with the SEC that TI's charges of evidence tampering are totally unsupported by any evidence of deliberate or culpable misconduct and are highly exaggerated. We also find that the incident itself is of dubious relevance, and cannot constitute an "admission," since § 26 of the Exchange Act provides that no action or omission by the SEC shall be construed to mean that it "has in any way passed upon

the merits of, or given approval to, any security or any transaction or transactions herein," or that any statement or report filed with or examined by the SEC is true and accurate on its face. 15 U.S.C. § 78z. Section 23 of the Securities Act of 1933 contains similar language involving registration statements filed with the SEC. 15 U.S.C. § 77w. Both sections make it "unlawful" for the SEC to make such a representation of accuracy or approval. We find these statutes to be an effective negation of TI's arguments, and see no need to strike the pertinent sections of its memoranda.

The final prerequisite for a § 14(d) action is that the tender offeror would own more than 5% of the targeted equity securities after consummation of the proposed offer. TI does not deny that it was the beneficial owner of more than 5% of the claims in bankruptcy held by KRC creditors after its tender offer to the Dietrich class members, but does argue that its ownership of claims in reorganization cannot be equated with the beneficial ownership of Phoenix securities. We disagree. Upon tender of their claims, Dietrich class members were required to execute an assignment giving TI a power of attorney to exercise any and all of their rights. Once TI accepted an assignment, the only impediment to actual ownership of Phoenix equity securities was the trustee's issuance of Phoenix stock according to the predetermined formula set forth in the plan. As we noted earlier, the issuance of those securities appeared imminent, as evidenced by TI's contemporaneous statements in its tender offer. Although the legal uncertainties surrounding the consummation of the plan posed some threat of delay, the eventual issuance of the stock appeared highly probable.

We conclude that TI's offer falls within the scope of § 14(d) of the Exchange Act. As a consequence, TI was obliged to file an appropriate informational statement with the SEC. It is undisputed that it did not do so. Accordingly, TI's motion to dismiss the SEC's § 14(d) claim in Count 3 of the complaint is denied, and the SEC's motion for summary judgment on Count 3 is granted. We defer the question of relief to Part III of this memorandum.

## II. *The Claim of Fraudulent Nondisclosure and Misrepresentation*

Counts 1 and 2 of the SEC's complaint charge that TI's tender offer materials which it sent to the Dietrich class members contained numerous fraudulent misrepresentations and omissions, in violation of sections 10(b) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78n(e), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. The elements of an action for injunctive relief are the same under § 14(e) and Rule 10b–5, except that under § 14(e) the plaintiff must establish that the alleged fraud was in connection with a tender offer while under Rule 10b–5 the alleged fraud must be in connection with the purchase or sale of securities. *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687, 695–696 (2d Cir. 1973); *Berman v. Gerber Products Co.*, 454 F.Supp. 1310, 1316 (W.D.Mich.1978). Both sections prohibit untrue or misleading statements and omissions, as well as any fraudulent, deceptive or manipulative acts or practices. The alleged misrepresentations and omissions must be material. The standard of materiality is an objective one, and is identical under both sections. *Berman, supra* at 1322. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). This standard contemplates that the omitted fact would have significantly altered the "total mix" of information made available. *Id.* The issue of materiality is a mixed question of law and fact. The underlying objective facts are only the starting point for the inquiry, with the ultimate determination resting on "delicate assessments a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him ..." *Id.* at 450, 96 S.Ct. at 2133. This determination is normally inappropriate for summary judgment, unless reasonable minds could not differ on

the obvious importance or insignificance of an omitted fact to an investor's decision. *Valente v. Pepsico*, 454 F.Supp. 1228, 1238–39 (D.Del.1978).

The SEC alleges that TI's tender offer materials 1) omitted to disclose material financial information about KRC; 2) misrepresented and omitted to disclose material information about the trading market for Phoenix stock at the time of the tender offer; 3) failed to disclose the potential impact on Phoenix stock which could result from the reversal of several rulings by the reorganization court which were on appeal to the Court of Appeals for the Tenth Circuit; 4) misrepresented the comparability between the tender offer to the Dietrich class members and the prior tender offer to the senior and "trade" creditors. Each side has moved for summary judgment on all of the fraud claims, relying on certain affidavits and exhibits. We will examine each of the claims individually.

### A. Financial Information about King Resources

TI's solicitation materials to the Dietrich class members reported that the reorganization court had set King's value as a going concern at between $90 million and $100 million. However, they did not include certain underlying financial calculations which were used to arrive at this figure, and did not report the SEC's opinion on the valuation evidence which was adduced at the court hearings on the plan. The SEC claims that these omissions were material and fraudulent. Specifically, the SEC argues that TI should have disclosed the value of KRC's producing and non–producing properties, and the trustee's forecasts of KRC's net income and net cash from its operations during the five–year period between 1975 and 1979. (Ponzio aff. ¶ 18).

In its original advisory report of August, 1975, the SEC agreed with the trustee that KRC was insolvent. It set KRC liabilities at a figure in excess of $100 million and valued KRC's assets at about $70 million. The asset valuation was consistent with the reorganization court's preliminary finding that the value of the assets was between $60 million and $80 million. On July 1, 1977, about a month after the trustee submitted the plan of reorganization which would later receive judicial approval, the SEC submitted a Second Advisory Report in which it cited new valuation evidence which purportedly demonstrated that KRC could no longer be regarded as insolvent. (Order in Response to Second Advisory Report of the SEC, p. 1).

The report stated that KRC's producing properties had undergone a dramatic increase in value between 1973 and 1977, from $30 million to $113 million (p. 18), while KRC's non–producing properties had remained relatively constant at about $35 million (p. 35). Although the *ex parte* character of the new valuation data made the SEC reluctant to conclude that the total estate was worth a combined amount of about $150 million, the SEC was confident enough to conclude that the original valuation figure of $70 million was "hopelessly obsolete" and that there was "very strong evidence" that the estate had sufficient producing reserves to cover all pre–bankruptcy claims (pp. 26, 28). The Second Advisory Report also contained a comparison of the trustee's operating and income forecasts based on the "obsolete" and the new valuation data. The trustee's original projections, for the years 1975–79, showed that net revenues would increase steadily from $7.6 million to $11.1 million, while net cash would decline steadily from $1.9 million to $0.3 million. Based on the new data, the trustee calculated that KRC's pre–tax income from its existing properties would remain close to $11 million for each year between 1977 and 1979. (p. 26).

The Second Advisory Report, containing this financial information, was sent to KRC's creditors in July, 1977 along with other materials designed to provide them with relevant data and analysis upon which they could cast their vote for or against the proposed plan. *See* Chap. X Rule 10–303(e); Corotto, *supra* at 1578. However, these materials were only sent to the Dietrich class representative, not to the individ-

ual class members. When TI made its tender offer to the senior creditors in August, 1977, it incorporated these materials by reference into its offer, since the senior creditors already had received them. However, TI made no reference to the materials or the Second Advisory Report when it made its tender offer to the Dietrich class members in December, 1977, and TI did not furnish any of those materials with its offer. The SEC points to TI's ready access to the report, and its unequal disclosure of its contents to the two groups of offerees, as persuasive evidence that TI's omission of the data in the report was a material and misleading one.

In response to the SEC's claim of inadequate disclosure of this financial information, TI argues that the Williams Act does not require it to disclose financial information about a target company, that the Act does not require it to disclose information which, like the report, is publicly available, and that the data in the report is not material since it was rejected by the reorganization court prior to confirmation of the plan.

■ We question TI's assertion that it is under no obligation to disclose financial information about a target company. *See Weeks Dredging & Contracting v. American Dredging*, 451 F.Supp. 468, 477–78, 481–82 (E.D.Pa.1978) (value of target's stock and equipment); *Valente v. Pepsico*, 454 F.Supp. 1228, 1243 (D.Del.1978) (improvement in target's earnings performance). We also see little merit in its argument that the Second Advisory Report falls within the category of "readily available" financial information which is excused from disclosure. *Valente, supra* at 1243. It is hardly sufficient that the 20,000 Dietrich class members scattered "throughout the world" (Complaint, ¶ 10) could have read the document in regional SEC offices in four major American cities during the two–week period of the tender offer. However, we agree with TI that the challenged omissions concern data which was either rejected or discredited by the reorganization court, and therefore fail the test of materiality as a matter of law.

In its order responding to the SEC's Second Advisory Report, which was filed some five months before TI's tender offer, the reorganization court took issue with the SEC's valuation theories and its income forecasts. It found that "the SEC's suggested higher valuation is conjectural and is not supported by concrete, definite, reliable or competent evidence." With respect to the income forecasts, it noted that over the past three years (1974–76), KRC's actual earnings had averaged about $3 million. By contrast, the SEC projected that KRC's earnings for the next three years (1977–79) would average about $11 million, and opined that $12 million was "a fair representation of the earning power of the existing assets on a going concern basis." The reorganization court found that this fourfold leap in earnings was unrealistic and conjectural, and stated "that the actual earnings record of the past three years is a [more] reliable criterion of future performance."

Given this judicial rejection of the financial information, we see no likelihood that the Dietrich class members would have attached substantial significance to this data in making their tender offer decision. Indeed, to disclose this financial data based upon such conjectural or unreliable evidence might itself have been misleading. TI was completely accurate in disclosing the final valuation figure ($90–100 million) fixed by the reorganization court, and a greater specification of the underlying valuation controversy could have created unnecessary confusion and prolixity in the offering materials. *See Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1085–86 (5th Cir. 1970); *Freedman v. Barrow*, 427 F.Supp. 1129 (S.D.N.Y.1976).

For these reasons we reject, as a matter of law, the SEC's allegation that TI failed to disclose material financial information concerning KRC and grant summary judgment to TI on this allegation of material omission.

**B. The Current Market for Phoenix Stock**

In its solicitation materials, TI reported that shares of the new Phoenix stock had

been trading since mid–November in the over–the–counter market on a "when, as and if issued" basis. TI also stated that since trading began, the "bid" price of Class B stock had ranged from $14 to $17 ½ per share, and the "bid" price of Class A stock had a range approximately 1½ times that level, in proportion to its convertibility into 1½ shares of Class B stock. TI's offer of $0.86 for each $1.00 of claims held by the Dietrich class members was equivalent to an offer of $13.77 for each share of Class B stock.[5]

■ The SEC charges that TI's disclosure was misleading or incomplete in two respects. First, although the SEC does not challenge the accuracy of the range of market "*bid*" prices of Phoenix stock, it contends that TI should also have stated that the range of market "*ask*" prices was from $15¼ to $18 per share, that the lowest "ask" and "bid" prices occurred during the opening week of trading, that the "ask" and "bid" prices steadily increased, and "ask" levelled off at $18 during the week prior to TI's tender offer. Second, the tender offer failed to convert this $18 "ask" price into a figure of $1.12 for each $1.00 of allowed claims, thereby permitting a better comparison of the market and tender offer values. (Ponzio aff. ¶¶ 15, 21).

TI's disclosure of "bid" prices was in complete conformity with the SEC's own published rule on the information to be contained in tender offer statements filed pursuant to § 14(d)(1) of the Exchange Act. That rule requires an offeror to:

> Identify the principal market in which [the] securities [being sought] are traded and state the high and low *sales* prices for such securities in such principal market (or, in absence thereof, *the range of high and low bid quotations*) for each quarterly period during the past two years. (17 C.F.R. § 240.14d–100, Item

1(c), effective Aug. 31, 1977, 42 Fed.Reg. 38341 (July 28, 1977)). (emphasis added).

TI did exactly that. According to the company's executive vice president, TI received its published bid prices from a major brokerage firm, which in turn obtained that information from market makers in Phoenix stock, including Arbitrage Securities. (Gist aff. ¶ 3).

The SEC argues that "ask" as well as "bid" prices should have been disclosed, so that Dietrich class members could have compared TI's tender offer "to what *might* be obtainable by selling in [the OTC] market." (SEC Reply Br. p. 16). The SEC's "might" standard is reminiscent of the now–rejected theory that tender offerors must disclose all information which "might" be considered important by a reasonable shareholder. *TSC Industries v. Northway*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). That theory has been replaced by a "would" standard, and we believe the same reasoning compels the conclusion that a shareholder need only be told what price he probably *would* receive in the current market. By that standard, the buyer's "bid" prices are a more accurate and meaningful reflection of the current market than the seller's "ask" prices. Therefore, we hold that, as a matter of law, TI was not obliged to disclose the relevant "ask" prices for the Phoenix stock, and we grant summary judgment to TI on this issue of material omission.

■ The SEC's second objection to the disclosure of the market information was that TI failed to convert the $18 "ask" price into a $1.12 per $1.00 claim figure for easier comparability with the $0.86 tender offer price. Even assuming that the $18 ask price should have been disclosed, this additional mathematical computation is superfluous. TI's materials clearly stated that

---

5. Under the plan of reorganization, the Dietrich class was entitled to receive 25 shares of Class A and 25 shares of Class B stock for each $1,000 of allowed claims. The class owned $13 million in claims, which entitled them to a total of 325,000 shares of Class A and 325,000 shares of Class B stock. Assuming convertibility at

the 1.5 A to B ratio, they were entitled to a total of 812,500 shares of Class B stock. Under the terms of TI's offer, it would pay $11.18 million ($13 million of claims × $0.86 per dollar of claim) for these 812,500 shares, or $13.77 per share.

its offer was equivalent to a price of $13.77 per share and that the OTC market ranged from $14–17 per share. These per share figures yield the same comparative ratio as the SEC's suggested per claim figures, since the conversion factor between claims and shares is a fixed proportion. Therefore, the SEC's suggestion is little more than a drafting comment which creates a qualitative but not a quantitative difference. As a matter of law, it does not constitute a material omission and we grant summary judgment to TI on this issue of material omission.

### C. The Pending Appeals in the Tenth Circuit

Several of the reorganization court's rulings in conjunction with its confirmation of the plan were appealed to the Court of Appeals for the Tenth Circuit in October and November, 1977, one or two months prior to TI's tender offer. TI's offering materials described the pertinent rulings and the pending appeals in some detail. TI stated that at the time of confirmation, the court reaffirmed its earlier finding that KRC was insolvent, placed KRC's value as a going concern at between $90 million and $100 million, and denied a motion by certain trustees to eliminate that feature of the plan which provided for the conversion of Class A stock into Class B stock. TI also noted that the court's rulings on insolvency, on the fairness and feasibility of the plan, and on the motion attacking the conversion feature had been appealed. Finally, TI stated that "the outcome of the various motions and appeals and their impact on the Plan cannot be determined at this time."

The SEC claims that TI's discussion of the appeals were deficient in two respects. First, TI failed to compute the value of Phoenix's stock if the appellate court disagreed with the reorganization court's valuation of KRC's assets, and instead accepted the higher valuation figures proposed by the SEC. Second, it failed to compute the value of TI's tender offer to the Dietrich class members assuming that the chal-

lenged conversion feature of the plan were eliminated on appeal.

To evaluate the SEC's claims, we must first outline the general standard of materiality as it applies to prospective events. That standard is succinctly stated in *Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 251 (2d Cir. 1973):

> To be material a statement in a tender offer need not necessarily relate to a past or existing condition or event. It may refer to a prospective event, even though the event may not occur, provided there appears to be a reasonable likelihood of its future occurrence. ... A reasonable stockholder, once informed of the contingency, can then determine whether to assume the risk of its occurrence or non–occurrence in accepting or rejecting the tender offer. Where the event, if it should occur, could influence the stockholder's decision to tender, the chance that it might well occur is a factor that should be disclosed to the investor in making his or her decision. (Citations omitted).

In applying these principles, at least one court has held that a tender offeror was obliged to disclose the fact that substantial legal obstacles, perhaps resolvable only through litigation, stood in the way of its stated goal of gaining control of the target company. *Alaska Interstate Co. v. McMillian*, 402 F.Supp. 532, 553, 575 (D.Del.1975); see Aranow, Einhorn & Berlstein, *supra* at 69–71.

In the present case, TI clearly disclosed in its materials that appellate proceedings were pending, had a potential impact on the plan, and could delay its final consummation. However, TI did not attempt to predict any specific impact on the plan assuming various alternative outcomes on appeal. The SEC seeks to impose this obligation on TI. We think such a burden is wholly unjustified.

There is a tremendous difference between disclosing the likelihood of litigation and disclosing its probable result. The first is at least partially a function of objectively verifiable factors, such as the stated inten-

tions of the parties, their willingness to compromise, and the requirements imposed by existing contractual agreements. The second is largely a speculative judgment, especially in the complex field of securities and bankruptcy law, where a multitude of factual detail, statutory interconnections and relief options often put even the most skilled lawyers on unsettled or uncertain legal ground. We can think of no method, short of divine inspiration, by which TI could have perceived a "reasonable likelihood" that the appeals would be decided one way or another. The reorganization court recognized that the valuation issues posed "inherent uncertainties." (Order in Response to Second Advisory Report of the SEC, p. 1). Those valuation issues were closely tied to the fairness of the conversion feature in the plan. We think that TI was accurate in limiting its comments to a description of the issues on appeal and a statement that the appeal may affect the plan. It was not required to speculate on potential outcomes. Indeed, such speculations could have confused or misled the shareholders. *See Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (3d Cir.1972), *cert. denied*, 409 U.S. 974, 93 S.Ct. 120, 34 L.Ed.2d 126. Accordingly we grant summary judgment to TI on this issue of material omission.

### D. The Comparability of TI's Two Tender Offers

TI's first move toward acquiring KRC was made in August, 1977, when it offered certain senior and "trade" creditors $1.02 for each $1.00 of their claims. Four months later, TI took a second step by offering the Dietrich class members $0.86 for each $1.00 of their claims. In the second paragraph of its cover letter of the solicitation materials it sent to the Dietrich class members, TI made a statement which compared these two offers. The statement was conspicuously typed in all capital letters, and read as follows:

THE AMOUNT BEING OFFERED TO YOU IS MORE THAN THE AMOUNT PAID BY TEXAS INTERNATIONAL FOR THE CLAIMS OF SENIOR CREDITORS OF KING, BASED UPON THE NUMBER OF SHARES OF STOCK IN KING TO BE RECEIVED BY YOU. SEE SECTION 6 OF THE OFFER TO PURCHASE, "INFORMATION ABOUT KING–TI'S PURCHASES."

Section 6 of the offering materials elaborated upon this assertion, explaining that TI had paid the senior creditors $26.7 million for the right to receive 1,305,000 shares of Class A stock, which was convertible into 1,958,000 shares of Class B stock. TI stated that this payment converted into a price of $13.64 per share. TI then explained that its offer of $0.86 on the dollar was equivalent to a price of $13.77 per share.[6]

While not disputing the accuracy of TI's mathematical computations, the SEC charges that TI's statement in its cover letter was materially misleading because it highlighted only one aspect of the two offers and failed to provide full information which would have put the offered amounts in their proper perspective. Specifically, TI failed to explain that although the senior creditors received less money per share of Class B stock than the Dietrich class members, they were entitled to receive more shares of Class B stock for each $1,000 of their claims.

Under the plan, senior creditors would receive 50 shares of Class A stock for each $1,000 of claims, or the equivalent of 75 Class B shares after full conversion. Dietrich class members would receive 25 shares of Class A and 25 shares of Class B stock for each $1,000 of claims, or the equivalent of 62.5 Class B shares after full conversion. If we multiply the number of Class B shares per $1,000 of claims times the price per share contained in TI's two offers, we find that senior creditors would receive a total of $1,020 per $1,000 of claims, while Dietrich class members would receive $860 per $1,000 of claims. In other words, the senior creditors would receive more money on a per claim basis, even though their per

---

**6.** See fn. 5, p. 1248 *supra*.

share take was less. The ratio between these totals is, of course, the same as that provided by a direct comparison of the prices in the two offers–$0.86 and $1.02 per dollar of claim. TI did not provide such a direct comparison in its materials. It did mention the $1.02 figure as the price it paid for claims of the "trade" creditors, and it stated that those claims were purchased simultaneously with the claims of senior creditors, but it nowhere stated that senior creditors were paid $1.02 on the dollar. In fact, the implication of parity between trade and senior creditors was negated by TI's statement that the trade creditors received the equivalent of $16.57 per share of Class B stock, nearly $3.00 more than the senior creditors.

 A disparity in the treatment between two classes of shareholders included in a tender offer is generally of great importance to the disfavored shareholder and should be disclosed. *Valente v. Pepsico, Inc.*, 454 F.Supp. 1228, 1244 (D.Del.1978); *Gould v. American–Hawaiian S. S. Co.*, 535 F.2d 761, 771 (3d Cir. 1976). Furthermore, "omission of a fact which makes a statement concerning the value of the target company's share misleading is material, for value of the stock is likely to be an important consideration to the shareholder." *Weeks Dredging & Contracting v. American Dredging*, 451 F.Supp. 468, 477 (E.D.Pa. 1978). In the present case, we hold that the SEC has demonstrated that TI's statement on the comparability of the two offers was materially misleading. In its solicitation materials, TI gave predominant emphasis to its assertion that the Dietrich offer was worth more than the offer to the senior creditors on a per share basis. That per share method of computation when viewed in isolation is inherently misleading since the share distributions to the two groups of creditors under the plan were unequal. A per claim comparison is necessary to give the proper weight to the two offers, because it speaks in a uniform currency which is untainted by the application of the terms of the plan. In other words, a dollar per claim formulation provides a pure comparison of the total amount of money offered to each class. By that standard, the Dietrich class members in fact would receive less than the senior creditors.

TI argues that it preserved the accuracy of its statement by adding the provision that its price comparison was "based upon the number of shares of stock in King to be received by [the Dietrich class members]." However, this statement is only partially curative, since it suggests that the price comparison is limited to a per share basis but does not provide alternative data on a per claim basis. In addition, the qualifying language is ambiguous, and erroneously suggests that the value of the total package is greater for the Dietrich class members.

Accordingly, we grant summary judgment to the SEC on this issue of material misrepresentation and omission.

### E. The Scienter Requirement

██ There is one additional issue we must address. TI contends that in addition to materiality, the SEC must show that TI's alleged omissions or misrepresentations were made with scienter. In its briefs it relied primarily on *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), where the Supreme Court held that some showing of scienter– "a mental state embracing intent to deceive, manipulate or defraud," 425 U.S. at 193 n.12, 96 S.Ct. at 1381 n.12–is an essential element of a damage claim by a private litigant under § 10(b) of the Exchange Act. The Court left open the question of whether reckless behavior might also be sufficient to impose liability, and whether scienter is a necessary element in SEC injunctive actions. 425 U.S. at 193 n.12, 96 S.Ct. at 1381. Insofar as an action under § 10(b) and Rule 10b–5 is concerned the Court has now resolved the question and imposed a proof of scienter burden on the SEC. *Aaron v. SEC*, —— U.S. ——, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980).

The second question is whether a similar standard of scienter should also apply to SEC actions brought under § 14(e) of the Exchange Act. That issue, too, has been

left open in Supreme Court decisions. *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 47, 97 S.Ct. 926, 952, 51 L.Ed.2d 124 (1977). Nevertheless, federal courts have consistently held that the similarity in language between the two sections justifies a requirement of some culpability in private actions under § 14(e). *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362–63, 397–98 (2d Cir. 1973); *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 606 (5th Cir. 1974); *Lowenschuss v. Kane*, 520 F.2d 255, 268 n.10 (2d Cir. 1975); *A & K Railroad Materials v. Green Bay & W. R. Co.*, 437 F.Supp. 636, 641–42 (E.D.Wis.1977). The Seventh Circuit has accepted the reasonableness of this conclusion, short of adopting the conclusion itself. *Indiana Nat'l Bank v. Mobil Oil Corp.*, 578 F.2d 180, 184 n.8 (7th Cir. 1978).

We agree that both sections merit the same standard of culpability. Section 10(b) makes it unlawful to use or employ "any manipulative or deceptive device or contrivance." Section 14(e) makes it unlawful for any person to "engage in any fraudulent, deceptive, or manipulative acts or practices." In *Hochfelder*, the Supreme Court held that the word "manipulative" is "especially significant," manifests an "unmistakable" congressional intent to prohibit something more odious than simple negligent conduct, and "connotes intentional or willful conduct designed to deceive or defraud investors . . ." 425 U.S. at 197–99, 96 S.Ct. at 1384. Moreover, unlike other sections of the Act which prohibit practices which "operate as a fraud or deceit" and therefore focus attention on the effect of potentially misleading conduct on the public, *see* 15 U.S.C. § 77q(a), section 14(e) and 10(b) both focus on the culpability of the person responsible. *SEC v. Coven, supra,* 581 F.2d at 1026; *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1962). We therefore hold that the SEC must prove scienter under either § 10(b) or § 14(e).

The final task before us on the scienter issue is to define the parameters of that concept. In *Aaron* the Court did not elaborate beyond its statements in *Hochfelder*. Accordingly, *Hochfelder* remains our guide.

Although the Court in *Hochfelder* initially defined scienter as a "mental state embracing intent to deceive, manipulate or defraud," it limited that definition to the case before it. 425 U.S. at 193–94 n.12, 96 S.Ct. at 1381. In other parts of the opinion, the Court seems to have recognized that scienter is not a rigid concept encompassing only the specific intent to accomplish a particular purpose. Thus, the Court expressly left open the question of whether reckless conduct could provide a sufficient basis for civil liability under § 10(b). *Id.* At another point, the Court described its holding as a "conclusion that § 10(b) was addressed to practices that involve *some element of scienter* and cannot be read to impose liability *for negligent conduct alone.*" 425 U.S. at 201, 96 S.Ct. at 1385 (emphasis added). Finally, Justice Powell stated that the statutory language "strongly suggest[s] that § 10(b) was intended to proscribe *knowing* or intentional misconduct." 425 U.S. at 197, 96 S.Ct. at 1383 (emphasis added).

Since *Hochfelder*, the federal trial and appellate courts have sought to give greater focus to that gray area of misconduct which is more culpable than mere negligence, but less egregious than willful intent to defraud. Noting that "there has not been any inter–Circuit controversy that *scienter* short of specific intent to defraud is sufficient to support liability," the Seventh Circuit has assessed Rule 10b–5 liability for reckless behavior. *Sunstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1044 n.16 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). It defined such conduct as:

"a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

*Wright v. Heizer Corp.*, 560 F.2d 236, 251–52 (7th Cir. 1977); *Sanders v. Nuveen &*

*Co.*, 554 F.2d 790 (7th Cir. 1977). This test is closer to intent than negligence, and is more egregious than "white heart/empty head" good faith. *Sundstrand Corp., supra*, 553 F.2d at 1045. Thus, on the objective side, there must be an actual or obvious danger that the omissions were misleading and, on the subjective side, the nondisclosures must be caused by more than the defendant's simple forgetfulness or inadvertence. *Id.* A few courts have ventured beyond recklessness, and have concluded that § 10(b) also reaches "knowing" conduct. Under this test, actual knowledge of the falsity or incompleteness of the disclosed information, combined with participation in the preparation or dissemination of the informational materials, is sufficient to satisfy the scienter requirement. *Nelson v. Serwold*, 576 F.2d 1332, 1336–38 (9th Cir. 1978); *Weinberger v. Kendrick*, 432 F.Supp. 316, 319 (S.D.N.Y.1977); *In Re Transocean Tender Offer Securities Litigation*, 455 F.Supp. 999, 1009–12 (N.D.Ill.1978).

On the basis of the present record, the SEC has not established, as a matter of law, that TI's misrepresentation of the comparability of the two offers to the senior creditors and the Dietrich class members was either knowingly or recklessly made. Indeed, it has not shown a reasonable likelihood of success on the merits on this issue. SEC contends that its burden is fulfilled because TI at all times possessed the allegedly material information on comparability, yet failed to disclose it. However, mere possession and nondisclosure is not sufficient: there must also be actual knowledge of its falsity or incompleteness. TI has submitted an affidavit from its Executive Vice President, Mr. Gist, which negates such knowledge. Gist states that he closely followed the KRC reorganization proceedings beginning in November, 1976 and believed at the time of the mailing of the Dietrich solicitation that those offering materials contained a full and fair disclosure of all material facts. He also states that he relied on the advice of his counsel that neither the federal securities laws nor the SEC's rules required TI to file its offering materials with the SEC or to make a fuller

disclosure. Finally, he quotes a statement from KRC's trustee, made after the Dietrich tender offer, in which the trustee said he found no reason to doubt the accuracy of TI's offering materials. Although Gist's self–serving affidavit untested by cross–examination is not conclusive, the scanty evidence we presently have before us does not convince us that TI knowingly or recklessly violated the statute. In short, a disputed issue of fact exists on the issue of scienter which we decline to resolve without a full evidentiary hearing. Accordingly, the cross–motions for summary judgment are denied on the issue of scienter.

In addition, SEC's motion for a preliminary injunction is denied on the fraud issues.

### III. *Relief*

The only remaining issue is whether permanent injunctive relief is appropriate for Count 3 of the complaint, since TI's failure to file the appropriate tender offer statement under § 14(d) of the Act has been established. In part 3 of its prayer, the SEC has requested a permanent injunction to require TI to comply with that statutory obligation, and has also requested an order requiring TI to make an offer of rescission to the Dietrich class members who accepted its tender offer.

#### A. Injunctive Relief

Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), empowers the SEC to bring an action for injunctive relief when it appears that any person "is engaged or about to engage in any acts or practices which constitute or will constitute a violation" of that Act or its implementing regulations. A permanent or temporary injunction or restraining order will be granted "upon a proper showing." Under this standard, the SEC need not show irreparable harm but need only show that the statutory conditions have been satisfied. *SEC v. American Realty Trust*, 429 F.Supp. 1148, 1174 (E.D.Va.1977). This determination involves an evaluation of past, present, and possible future violations. "A simple con-

clusion that illegal activity has occurred, without more, does not provide a basis for relief." *Id.* at 1174. Although past illegal conduct is "highly suggestive of the likelihood of future violations," *SEC v. Keller Corp.*, 323 F.2d 397, 402 (7th Cir. 1963), the critical question is whether there is a reasonable likelihood that the wrong will be repeated. *SEC v. Cenco, Inc.*, 436 F.Supp. 193, 197 (N.D.Ill.1977). That inference requires an appraisal of the totality of the circumstances and factors suggesting that the violation may or may not have been an isolated occurrence. The relevant factors include the character of the past violations, the effectiveness of the discontinuance, the bona fides of the expressed intent to comply, the number and duration of past wrongs, the time which has elapsed since the last violation, the opportunity to commit further illegal acts, the novelty of the violation, the harmful impact of the injunction on the defendant and the willfulness or bad faith in a defendant's prior conduct. *SEC v. National Student Marketing Corp.*, 360 F.Supp. 284, 297 (D.D.C.1973); *SEC v. Koracorp Industries*, 575 F.2d 692, 699 (9th Cir. 1978).

The SEC characterizes TI's failure to file its offering materials with the SEC as a continuing violation since those materials have yet to be filed. However, § 14(d) requires all offering materials to be filed "at the time copies of the offer ... are first published or sent or given to security holders," and that all subsequent materials shall be filed "not later than the date such materials is first published or sent or given to any security holders." At worst, those time limits expired in late December, 1977. There have been no subsequent events which triggered additional violations of the Act. Therefore, we reject the SEC's continuing violation theory. Thus, no violations of § 14(d) have occurred over the past two years. In addition, since the tender offer in question expired on January 6, 1978, the targeted investors have nothing to gain from a belated filing with the SEC.

The SEC contends that because TI made two tender offers for control of KRC, and has acquired twenty–six companies since 1966, it is an "acquisition–minded" company and will likely be making more purchases in the future. However, this fact is outweighed by the novelty of the circumstances surrounding the Dietrich offer. The offer erupted at the confluence of two uncharted streams of bankruptcy and securities law, where the application of § 14(d) was a legal issue of genuine uncertainty and unique complexity.

Finally, the SEC has failed to demonstrate any willfulness or bad faith in TI's conduct. Although TI, in turn, has failed to express an intention of voluntarily complying with § 14(d), we believe that its reluctance stems from a good faith belief in an erroneous construction of federal statutes. Therefore, we find that, under all the circumstances, the SEC has not made a proper showing for a permanent injunction on Count 3 of its complaint.

**B. Rescission**

In addition to an injunction enjoining TI from future violations, the SEC also seeks relief in the form of an order requiring TI to make a full rescission offer to all Dietrich class members. Section 27 of the 1934 Act, 15 U.S.C. § 78aa, under which this action is brought, confers general equity powers upon the district courts. *SEC v. Investors Security Corp.*, 560 F.2d 561, 566–67 (3d Cir. 1977). "Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972). The available remedies include a rescission order. *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 390–91 (2d Cir. 1973). These remedies are available even though no injunctive relief is granted. *SEC v. Penn Central Co.*, 425 F.Supp. 593, 599 (E.D.Pa.1976). In general, the court's equity power is to be exercised when it effectuates the statutory purposes, such as by depriving defendants of gains made through violations, by deterring future violations,

and by increasing the overall efficiency of private actions. *Chris–Craft Industries, supra; SEC v. Penn Central Co., supra.*

Although we have found TI in violation of the federal securities laws by failing to file its tender offer materials with the SEC, this violation in itself does not warrant a rescission order. Noncompliance with the reporting and filing requirements of the Williams Act does not necessarily result in injury or prejudice to investors. The tender offer materials may be unassailable under the anti–fraud provisions of the securities laws even though the SEC has been deprived of an opportunity for supervision over the solicitation. The SEC has not, at least at this stage of the proceedings, proved that TI's tender offer materials contained any fraudulent misrepresentations or omissions. In the absence of such violations, the use of a rescission order for noncompliance with statutory filing requirements strikes us as a disproportionately severe remedy which does not effectuate the statutory purposes. Accordingly, the SEC's prayer for a rescission order is denied pending final adjudication of the fraud issues.

### IV. *Conclusion*

To summarize, TI's motion to dismiss Count 3 of the complaint is denied. The SEC's motion for summary judgment on Count 3 is granted. TI's motion for summary judgment on Counts 1 and 2 is granted as to all but the claim set forth in II(D) and the issue of scienter set forth in II(E) of this memorandum. The SEC's motion for summary judgment on Counts 1 and 2, its motion to strike, its motion for a preliminary injunction and its motion for a permanent injunction are denied in their entirety. Cause set for report on status November 14, 1980 at 11:00 a. m.